(No. 64818.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALTON COLEMAN, Appellant.

*Opinion filed June 19, 1989.—Rehearing*
*denied September 29, 1989.*

322

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, and Elizabeth Dale Caddick, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

The defendant, Alton Coleman, was charged by indictment in the circuit court of Lake County for the murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(2), (a)(3)) and aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(a)(3)) of Vernita Wheat. A jury found the defendant guilty of each charge. The State requested a hearing to consider whether the death penalty should be imposed. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) The same jury found the defendant eligible for the death penalty and found there were no mitigating factors sufficient to preclude a sentence of death. The circuit court sentenced the defendant to death and to a 15-year term of imprisonment on the aggravated kidnapping conviction. The death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The issues presented for review are: (1) whether the defendant made a knowing and intelligent waiver of counsel at the guilt and sentencing phases of his trial; (2) whether the circuit court erred in denying the defendant's motion to suppress; (3) whether the jury improperly relied on section 9—1(b)(7) to establish the defendant's eligibility for the death sentence; (4) whether the defendant was denied a fair sentencing hearing because

the prosecutor characterized him as an "animal" during closing arguments; and (5) whether the defendant was denied a fair sentencing hearing because the jury was not instructed on the alternative mandatory sentence of natural life imprisonment. The defendant also challenges the constitutionality of the Illinois death penalty statute.

The following evidence was adduced at the guilt phase of the defendant's trial. The partially decomposed body of nine-year-old Vernita Wheat was discovered in an abandoned building in Waukegan, Illinois, on June 19, 1984. Her chest, neck and hands were bound with cable wire. Dr. Larry Blum, assigned to the case, determined that the cause of death was ligature strangulation. Dr. Blum opined that the death occurred approximately three weeks prior to the discovery of the body. Dr. Bernard Greenberg, a forensic entomologist, studied the development of the fly larvae found on the victim's body and opined that the body was deposited in the building on either May 29 or May 30.

Juanita Wheat, the victim's mother, testified that at the time of the offense she resided in Kenosha, Wisconsin, with her daughter, Vernita, and her seven-year-old son, Brandon. At the end of April or beginning of May of 1984, the defendant introduced himself to Juanita as Robert Knight, showed her an identification card bearing that name, and told her he lived two blocks away. The defendant actually lived in Waukegan. That evening the defendant ate dinner with Juanita at her apartment and played with her children. Several days later the defendant returned to Juanita's apartment, spent time with Juanita and her children, and met Juanita's cousin, Willie Mae Peebles. On May 29, 1984, the defendant returned to Juanita's apartment building and without invitation entered the apartment of Juanita's neighbor, Ellen Reeves, whom Juanita was visiting. Juanita introduced the defendant to Reeves. With Juanita's permission, the

defendant then took the children to a carnival, and returned them to Juanita's apartment by 10:15 p.m. Juanita then allowed Vernita to accompany the defendant to his apartment "to pick up a stereo system." When the defendant had not returned Vernita by 10:45 p.m., Juanita and Reeves began searching for her. Approximately one hour later Juanita telephoned the police.

On the following day, Juanita and Reeves identified the defendant's photograph at the police station. Juanita, Reeves and Peebles identified the defendant in court.

Ernesto Zertuche, a patron of an establishment in Kenosha called the "400 Club," testified that a black man and a black girl entered the establishment at approximately 11:35 p.m. on May 29, 1984, and the man immediately used the telephone. A few minutes later a cab arrived to pick up the man and girl. Zertuche identified a photograph of Vernita Wheat as the girl he had seen at the 400 Club.

David McIntosh, another patron, corroborated the testimony of Zertuche. McIntosh identified the defendant and identified a photograph of Vernita Wheat as the man and girl he had seen at the 400 Club.

Keith Hach, a cab driver, testified that his cab was dispatched to the 400 Club at 11:35 p.m. on May 29, 1984. Once he arrived, a black man and black girl entered his cab. The man directed Hach to drive them to Zion, Illinois, "to pick up a stereo system." When they arrived at the designated house, the man tapped Hach on the shoulder and told him to drive them to Waukegan. Hach drove the man and girl to "Slater's Barbecue" in Waukegan.

James Adams, an employee at the Diamond Scrap Yard located next to Slater's Barbecue, testified that he was working during the early morning hours of May 30, 1984. At approximately 1:30 a.m., he saw a black man

and a black girl walking "in the middle of the street as if they had came out of Slater's."

On behalf of the defense, Anna Ross testified that she saw the defendant and Vernita Wheat walking past her house during the afternoon of May 30, 1984. Ross waved to Vernita and Vernita waved back.

Patricia Parks, a friend of the defendant, testified that the defendant came to her residence during the morning of May 31, 1984, and asked her to leave town with him. She declined.

Joseph Thompson, another friend of the defendant, testified that he drove the defendant to a "record shop" in Chicago at approximately noon on May 31, 1984, so that the defendant could obtain false identification cards. Afterwards, Thompson drove the defendant to a train station in Evanston, Illinois.

Terri Coleman, the defendant's sister, testified that the defendant visited with her briefly at her house in Waukegan at approximately 7 p.m. on May 31, 1984. She informed the defendant that the police had asked her about a "girl in Kenosha."

Officer Michael Bettasso testified that he was dispatched to Terri Coleman's house at 7 p.m. on May 31, 1984. He stated that the police had information that a cab had taken the defendant to that location. When Officer Bettasso arrived, he saw a black man, whom he identified as the defendant, leaving the house. The defendant saw Officer Bettasso, turned and fled. Officer Bettasso pursued the defendant, but was unable to apprehend him.

On June 19, 1984, Andrew Greenwood and Murry Smith discovered Vernita Wheat's body in the bathroom of an abandoned building in Waukegan. The abandoned building was located two blocks from Slater's Barbecue. Greenwood telephoned the police. After an investigation of the premises, two fingerprints were discovered on the

door of the bathroom: the first was unidentified and the second was identified as the defendant's.

The defendant was arrested in Evanston, Illinois, at approximately 10:40 a.m. on July 20, 1984. That afternoon the defendant told the police that he knew Juanita Wheat, but denied that he knew or killed Vernita Wheat.

A jury found the defendant guilty of the murder and aggravated kidnapping of Vernita Wheat. Following the conviction, the State requested a hearing to determine whether the death penalty should be imposed. After the first phase of the sentencing hearing, the jury found that the defendant was at least 18 years of age at the time of the offense (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)), and that there were two statutory aggravating factors in existence rendering the defendant eligible for the death penalty: (1) the defendant had previously been convicted of intentional murder in Indiana and Ohio, and the laws of those States were substantially similar to the laws of the State of Illinois (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)); and (2) the victim was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)). The jury rejected the State's argument that the defendant was eligible for the death penalty under section 9—1(b)(6) (the murdered individual was killed in the course of a felony by the defendant) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

At the second phase of the sentencing hearing, the State presented the following evidence in aggravation. The defendant was convicted and sentenced to death for the murders of Tamika Turks of Indiana and Tonnie Storey and Marlene Walters of Ohio.

The body of seven-year-old Tamika Turks was discovered in a wooded area of Gary, Indiana, on June 18, 1984. The cause of her death was ligature strangulation. At the defendant's trial for that offense, Annie Hillard,

Tamika's nine-year-old companion, testified that the defendant and a woman named Debra Brown abducted the two girls and took them to a wooded area, where Annie witnessed the defendant beat and strangle Tamika. Annie was then forced to have oral sex with the defendant and Brown, and the defendant raped her. The defendant and Brown then strangled Annie with a belt. She lost consciousness and was left for dead. Soon thereafter, Annie's mother discovered Annie lying in the wooded area and took her to a hospital. Annie's ripped vaginal area required surgery.

The partially decomposed body of 15-year-old Tonnie Storey was discovered in an abandoned building in Evanston, Ohio, on July 21, 1984. The cause of her death was strangulation. At the defendant's trial for that offense, Tonnie's parents testified that they last saw Tonnie on July 11, 1984. Yvette Lewis, Tonnie's classmate, testified that she saw Tonnie walking with the defendant and Brown at approximately 6 p.m. on July 11, 1984. A fingerprint identified as Brown's was discovered on Tonnie's Michael Jackson button, which was found 10 feet from her body. A shoeprint matching the defendant's was also discovered near Tonnie's body.

The body of Marlene Walters was discovered in her house in Norwood, Ohio, on July 13, 1984. At the defendant's trial for that offense, Harry Walters, Marlene's husband, testified that the defendant and Brown attacked him in their house at approximately 10:30 a.m. on July 13, 1984. Harry lost consciousness and remained comatose until September 1984. Marlene's body was discovered that evening. Her death was caused by blows to the head resulting in skull fractures and brain injuries. The defendant's fingerprints were found both inside and outside the house.

The State presented additional evidence in aggravation. First, the State presented evidence detailing the

defendant's involvement in four other murders: Donna Williams of Gary, Indiana, whose body was discovered in Detroit, Michigan, on July 11, 1984; Virginia Temple and her nine-year-old daughter, Rachelle, whose bodies were discovered in their house in Toledo, Ohio, on July 7, 1984; and Eugene Scott, whose body was discovered in a ditch near Indianapolis, Indiana, on July 19, 1984. Second, the State presented evidence showing the defendant's involvement in several other offenses, including attempted murder, sexual assault, robbery, and kidnapping. Finally, the State revealed that at the time the defendant murdered Vernita Wheat, he was on bond for another charge in Illinois.

The defendant then presented the following evidence in mitigation. Reverend Lloyd R. Davis, pastor of the Christian Fellowship Church in Waukegan, testified that he had known the defendant since August 4, 1986, and it was his belief that the defendant desired to make peace with God and to be spiritually saved.

After considering all of the evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude a sentence of death.

The defendant first asserts that he did not make a knowing and intelligent waiver of counsel at the guilt and sentencing phases of his trial. The defendant was represented by two public defenders: Mike Melius and Joan Pantsios. Six days before his trial, the defendant filed a motion to proceed *pro se*. The circuit court admonished the defendant of his right to counsel and, as an indigent, his right to court-appointed counsel. The circuit court further admonished the defendant of the nature of the charges against him, and informed him that the maximum sentence prescribed by law was the death penalty and the minimum sentence prescribed by law was a 20-year term of imprisonment. We note that the trial judge incorrectly admonished the defendant of

the minimum sentence. Under Illinois law, a defendant who has previously been convicted of murder is subject to a minimum sentence of natural life imprisonment. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c).) As the defendant had previously been convicted of murder in Indiana and Ohio, the minimum sentence he was eligible to receive was natural life imprisonment.

After admonishing the defendant, the circuit court granted his motion to proceed *pro se* and directed Melius and Pantsios to serve as advisors. After the guilt phase of his trial, the defendant requested that counsel be reappointed to represent him at his sentencing hearing. The circuit court reappointed Melius and Pantsios. After the first phase of his sentencing hearing, the defendant again filed a motion to proceed *pro se*. The circuit court admonished the defendant exactly as it did during the guilt phase of his trial, granted the defendant's motion to proceed *pro se* and directed Melius and Pantsios to serve as advisors.

The defendant contends that he did not make a knowing and intelligent waiver of counsel because the circuit court did not properly admonish him of the minimum sentence in accordance with Rule 401(a) (107 Ill. 2d R. 401(a)). Supreme Court Rule 401(a) provides:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." (107 Ill. 2d R. 401(a).)

The defendant emphasizes that supreme court rules are rules of procedure and it is incumbent upon courts to follow them. (*People v. Wilk* (1988), 124 Ill. 2d 93, 103; see *People v. Walker* (1982), 91 Ill. 2d 502, 517 (high standard of procedural accuracy is required in the imposition of the death penalty).) In response, the State argues that the circuit court substantially complied with Rule 401(a), and that despite its incorrect admonishment of the minimum sentence, the defendant made a knowing and intelligent waiver of counsel.

Substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel *if* the record indicates that the waiver was made knowingly and intelligently. (*People v. Johnson* (1987), 119 Ill. 2d 119, 132.) In that case, Johnson moved to proceed *pro se*; in admonishing him the circuit court incorrectly stated that the minimum sentence was a "number of years" rather than natural life imprisonment. With the exception of the minimum sentence, Johnson was properly admonished pursuant to Rule 401(a). The record indicated that despite the incorrect admonishment of the minimum sentence, Johnson knew that the minimum sentence was natural life imprisonment. The record further indicated that Johnson attempted to manipulate the proceedings by refusing the services of his counsel. The court concluded that Johnson made a knowing and intelligent waiver of counsel. *Johnson*, 119 Ill. 2d at 138.

In the instant case, the circuit court substantially complied with Rule 401(a). The circuit court admonished the defendant of his right to counsel, informed him of the nature of the charges against him and explained that the death penalty was the maximum sentence prescribed by law. Where a defendant knows the nature of the

charges against him and understands that as a result of those charges he may receive the death penalty, his knowledge and understanding that he may be eligible to receive a lesser sentence pales in comparison. See *People v. Stewart* (1984), 101 Ill. 2d 470, 486-87 (regarding Rule 402, where defendant knows he may receive the death penalty, trial court's failure to inform him of lesser sentences does not invalidate admonishments).

As we find that the circuit court substantially complied with Rule 401(a), we must next determine whether the defendant's waiver of counsel, despite the incorrect admonishment of the minimum sentence, was made knowingly and intelligently. The defendant asserts that if he had known the minimum sentence was natural life imprisonment rather than a 20-year term of imprisonment, he would not have waived counsel. In response, the State argues that the defendant knew the minimum sentence was natural life imprisonment; therefore, he made a knowing and intelligent waiver of counsel. After carefully reviewing the entire record, we find the defendant's assertion to be untenable.

At the defendant's arraignment, the circuit court engaged in the following colloquy:

"THE COURT: Murder has, as charged in these indictments, a possible penalty of, first, from 20 to 40 years in the penitentiary.

MR. CHANCEY (State's Attorney): Your honor, I think the minimum penalty, because he's been convicted of murder before, is natural life.

THE COURT: I think you may be correct. But I think that the question of the time of the offense and the conviction subsequent may, you know—I haven't seen the case law on that, I think there's at least, a legal issue which has to be resolved by a court. I'm not going to intend to resolve it, at this time.

MR. CHANCEY: Okay.

THE COURT: Murder has a possible penalty of from 20 to 40 years in the penitentiary. Again, under certain circumstances, including an age under 13 years, if the facts and circumstances of the offense indicate wanton cruelty, or heinous behavior on the part of the defendant, the possible penalty can be from 40 to 80 years in the penitentiary. Under other circumstances, the possible penalty can be natural life imprisonment. And that means natural life.

*The law does provide, in Illinois, that if you have a previous conviction for murder, that natural life must be applied.*

In addition thereto, you are charged with the commission of murder while committing a forceable felony. The possible penalty for murder can be the death penalty.

*Do you understand that?*

MR. COLEMAN: *Yes, I do.*" (Emphasis added.)

During the closing arguments at the sentencing hearing, the defendant on his own behalf argued:

"*Now, we ask the question, what do we do with Alton Coleman? Should he be put to death, or should he spend the rest of his natural life in prison?* That's the question we are concerned with. Two years ago, that is gone. You wouldn't even heard of Alton Coleman if they left me right in prison where I was at, no, they want a feather in their hat. They done convicted me and sentence me other places, but no, they want a feather in their hat, and I love this opportunity to address you right now, no matter what you come back with. I thank God I am able to address you right now. *We asking about should you sentence me to death or should the punishment be life imprisonment.* That is the question." (Emphasis added.)

The record reveals that from his arraignment to the closing arguments at his sentencing hearing, the defendant knew and understood that natural life imprisonment was the minimum sentence prescribed by law.

Equally compelling are the reasons given by the defendant as to why he chose to waive counsel and represent himself. The defendant's rationale indicates, first,

that his decision to waive counsel did not hinge to any degree on the minimum sentence prescribed by law; and, second, his decision was knowing and intelligent.

On June 2, 1986, seven months before his trial, the defendant filed a motion for appointment of special counsel because of an alleged conflict of interest between the public defender and the defendant. In 1977, the public defender represented the defendant's brother in an unrelated matter. Melius and Pantsios were not the attorneys of record in that matter. The circuit court noted that the 1977 cause did not create a conflict of interest. The defendant reiterated his concern and asked the court to appoint Lonnie Randolph, an Indiana attorney licensed in Illinois, as special counsel. The circuit court was willing to appoint Wayne Flanigan, a local attorney who the court noted was competent and experienced in capital cases, as special counsel, but the court was unwilling to appoint Randolph because it was unfamiliar with him and was concerned about the distance between his office in Indiana and the court in Lake County, Illinois. The defendant refused and stated that if the court would not appoint Randolph, he would represent himself. The defendant reconsidered and agreed to be represented by Melius and Pantsios.

On July 18, 1986, the defendant expressed his dissatisfaction with Pantsios and accused her of giving him personal gifts. Pantsios explained that she gave the defendant certain items at his request. On October 15, 1986, Pantsios filed a motion to withdraw as counsel because the defendant threatened to file a disciplinary complaint against her. The defendant stated that he did not want Pantsios to withdraw, and he further stated:

> "I have not filed any motion in regards to Miss Pantsios giving me gifts or what have you. I think if it was a problem it was self-created long ago."

On October 29, 1986, the defendant again expressed his dissatisfaction with Pantsios. He filed a motion for substitution of counsel alleging a conflict of interest between Pantsios and himself. The circuit court found that there was no conflict of interest, noted that Pantsios was competent and denied the motion. The defendant moved to proceed *pro se*. The circuit court asked the defendant to consider the consequences of that decision. On November 12, 1986, the defendant again filed a motion for substitution of counsel. The circuit court denied the motion because it was based on the same grounds as his previous motion. On November 19, 1986, the defendant filed a motion to proceed *pro se*, then decided to withdraw his motion. On December 30, 1986, six days before his trial, the defendant again filed a motion to proceed *pro se*. The circuit court admonished the defendant and granted his motion.

After the guilt phase of his trial, the defendant requested that counsel be reappointed for his sentencing hearing. Before the circuit court agreed to reappoint counsel, the following colloquy took place:

"THE COURT: So you think that [Pantsios] is competent and you should have her represent you?

THE DEFENDANT: There is no question from the start she is competent.

THE COURT: And you have no questions as to her loyalty towards you or her ability to act?

THE DEFENDANT: At this stage, your honor, my memory is exhausted, I think she is Perry Mason now."

The circuit court reappointed Melius and Pantsios.

After the first phase of the sentencing hearing, the defendant again filed a motion to proceed *pro se*. The circuit court admonished the defendant, in part, as follows:

"THE COURT: Well, you have a right to counsel, as you know, I guess I have appointed them, you have

elected to proceed *pro se,* so we have had them stand by, then you decided that you shouldn't proceed *pro se* any longer, that you had a headache, if I recall correctly Mrs. Pantsios looked like Perry Mason to you.

THE DEFENDANT: She still is Perry Mason, Your Honor, and she is capable not only of handling this trial but other trials, however, she don't have the personal knowledge that I have and I can't be hindered \*\*\*.''

The circuit court completed its admonishments to the defendant and granted his motion to proceed *pro se.*

During the closing arguments at his sentencing hearing, the defendant on his own behalf argued:

"I am very shocked that I have to be accidently brought before the court, representing myself for the reason because I want to be heard. Yes, I don't want to hide behind no lawyer. Alton Coleman want to be heard, and don't care if no one like it, I want to be heard, period. Don't want· to hide behind no lawyer, I don't want to stick behind a lawyer, who speak for me. Alton Coleman going to speak for himself, and he is going to speak for himself because I have something to say, and if it's like me or you don't, it doesn't has the bearings on what you have to do."

The foregoing indicates that, first, the defendant wanted the circuit court to appoint Lonnie Randolph as special counsel, and because the court refused to appoint Randolph, he preferred to represent himself; second, although the court and the defendant noted that the public defender who was assigned to the case was able and competent, the defendant preferred to represent himself because he had certain personal knowledge which the public defender did not have; and third, the defendant wanted to speak on his own behalf rather than having the public defender speak for him. The record therefore reflects that the defendant had specific, legitimate reasons for waiving his right to counsel, which demonstrates that the defendant would have waived counsel re-

gardless of the length of the minimum sentence prescribed by law.

After the court imposed the death sentence, the defendant asked that counsel be reappointed for his post-trial hearing. The circuit court reappointed the public defender. As Pantsios was familiar with the proceedings, she represented the defendant. Soon thereafter, the defendant expressed his dissatisfaction with Pantsios. In response, the circuit court made the following finding:

"THE COURT: You have attempted to manipulate the proceedings.

THE DEFENDANT: You can call it what you want, Your Honor.

THE COURT: And I am. And tried to frustrate this proceeding by raising specious objections, withdrawing them, asking for Mrs. Pantsios to be appointed, and then saying you don't want her."

The record supports the circuit court's finding that the defendant used his right to counsel and his right to waive counsel in a manner designed to frustrate and manipulate the proceedings.

Finally, after Pantsios finished preparing the defendant's motion for a new trial, the defendant filed a motion to proceed *pro se* at his post-trial hearing. The circuit court admonished the defendant of his rights, informed the defendant that the jury had imposed the death penalty, and granted his motion to proceed *pro se*. The defendant included the motion for a new trial, prepared by Pantsios, with his own post-trial motions, and argued the post-trial motions on his own behalf. The defendant's decision to represent himself, even after the jury had imposed the death penalty, stands in stark contrast to his assertion that he would not have waived counsel had he known that natural life imprisonment was the minimum sentence.

We hold that despite its incorrect admonishment of the minimum sentence, the circuit court sufficiently admonished the defendant in accordance with Rule 401(a) (107 Ill. 2d R. 401(a)), and that the defendant made a knowing and intelligent waiver of counsel at the guilt and sentencing phases of his trial. The record reveals that the defendant knew that the minimum sentence was natural life imprisonment, offered legitimate reasons for waiving his right to counsel, and attempted to manipulate the proceedings by repeatedly refusing the services of his counsel.

The defendant next asserts that the circuit court erred in denying his motion to suppress. On the day of the defendant's arrest, William Keefe, an FBI agent, questioned the defendant until the defendant asserted his right to counsel. Later that day, Marc Hansen, a Waukegan police officer, questioned the defendant, at which time he admitted having known Juanita Wheat, but denied having known or killed Vernita Wheat. On the day before his trial, the defendant filed a motion to suppress his statements to the FBI, arguing that they were obtained in violation of his fifth amendment right to counsel under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The circuit court granted the defendant's motion.

The defendant did not move to suppress his statements to Officer Hansen. At trial, the State questioned Officer Hansen about these statements. The defendant objected on "foundational" grounds, and the circuit court overruled the objection. The defendant's failure to raise this issue in his motion to suppress and to object on the proper grounds at trial resulted in a waiver of this issue through procedural default. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-82 (Ryan, C.J., concurring in part and dissenting in part).) Moreover, as the defendant

failed to make the circuit court aware of a possible violation of his fifth amendment right to counsel, the circuit court did not err in allowing Officer Hansen to testify. See *People v. Garcia* (1983), 97 Ill. 2d 58, 74 (trial court's ruling on motion to suppress will not be disturbed unless it is manifestly erroneous).

Even if we construe the defendant's "foundational" objection as sufficient to notify the circuit court of a possible violation of his fifth amendment right to counsel, Officer Hansen's testimony was harmless beyond a reasonable doubt. A reviewing court will not hold that an error is harmless unless the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's convictions. (*Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287-88.) In making this determination, the reviewing court will consider the effect that the unlawfully admitted evidence had on the properly admitted evidence. *Fahy v. Connecticut* (1963), 375 U.S. 85, 87, 11 L. Ed. 2d 171, 173-74, 84 S. Ct. 229, 231; *People v. St. Pierre* (1988), 122 Ill. 2d 95, 114.

Officer Hansen testified that the defendant admitted having known Juanita Wheat. Although inculpatory, Officer Hansen's testimony was merely cumulative because three other witnesses—Juanita Wheat, Ellen Reeves and Willie Mae Peebles—also testified that the defendant knew Juanita Wheat. In addition, Officer Hansen testified that the defendant denied having known or killed Vernita Wheat. This testimony was exculpatory and consistent with the defendant's position that he did not kill Vernita Wheat. We are therefore satisfied beyond a reasonable doubt that Officer Hansen's testimony did not contribute to the defendant's convictions.

The defendant next asserts that the jury improperly relied on section 9—1(b)(7) to establish his eligibility for

the death penalty. Section 9—1(b)(7) provides that a defendant who has been found guilty of murder may be sentenced to death if:

> "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7).)

The defendant argues that the section is unconstitutionally vague, or, in the alternative, the section is inapplicable to him because he contends the jury found that he did not personally kill Vernita Wheat.

The defendant first argues that section 9—1(b)(7) is unconstitutionally vague under the eighth amendment (U.S. Const., amend. VIII). The Supreme Court in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, held that an aggravating factor in the Oklahoma death penalty statute was unconstitutionally vague, as applied to that defendant, because the language—"especially heinous, atrocious, or cruel"—failed to guide or limit the discretion of the sentencing body. (*Maynard*, 486 U.S. at 364, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.) The defendant argues that section 9—1(b)(7) suffers from the same constitutional infirmity as the statute in *Maynard*. In response, the State argues that although the section contains language similar to the statute in *Maynard*, it is more specific in that it requires the murder victim to be "under 12 years of age," and the brutal or heinous behavior causing the death must be "indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7).) The State therefore argues that the section sufficiently guides or limits the discretion of the sentencing body.

The defendant argues that even if section 9—1(b)(7) is not unconstitutionally vague, the section is inapplicable to him because the jury found that he did not personally murder Vernita Wheat. At the first phase of the sentenc-

ing hearing, the State argued that there were three statutory aggravating factors rendering the defendant eligible for the death penalty: the defendant had previously been convicted of killing two or more individuals (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)); the murder victim was under 12 years of age and her death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)); and the murder victim was killed *by the defendant* in the course of a felony; in this case, aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). The jury found that the defendant was eligible for the death penalty under sections 9—1(b)(3) and (b)(7), but not under (b)(6). The defendant therefore contends that the jury concluded that either an accomplice or another individual murdered Vernita Wheat, but the defendant did not. The defendant further contends that the legislature did not intend for section 9—1(b)(7) to apply to a defendant who did not *personally* commit the murder. In response, the State argues that although the jury found the defendant ineligible for the death penalty under section 9—1(b)(6), the jury did find that the defendant personally murdered Vernita Wheat because it was not instructed on accomplice liability during the guilt phase of the trial. In the alternative, the State argues that even if the jury concluded that the defendant did not personally commit the murder, the legislature did not limit the applicability of section 9—1(b)(7), as it did with section 9—1(b)(6), to those who personally commit a murder.

As we find that the defendant was independently eligible for the death penalty under section 9—1(b)(3) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)), we need not decide whether section 9—1(b)(7) is unconstitutionally vague or inapplicable to the defendant. See *Zant v. Stephens* (1983), 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50; *Barclay v. Florida*

(1983), 463 U.S. 939, 956-58, 77 L. Ed. 2d 1134, 1148-49, 103 S. Ct. 3418, 3428-29 (plurality opinion); *Stringer v. Jackson* (5th Cir. 1988), 862 F.2d 1108, 1113-15.

In *Zant*, a jury found a Georgia defendant guilty of murder, and after finding that there were three statutory aggravating factors in existence, imposed the death penalty. The Georgia Supreme Court subsequently held that one of the three aggravating factors was unconstitutionally vague. The United States Supreme Court granted *certiorari* (454 U.S. 814, 70 L. Ed. 2d 82, 102 S. Ct. 90) to decide whether the death penalty must be vacated because one of the three aggravating factors which the jury relied upon was unconstitutional. *Zant*, 462 U.S. at 864, 77 L. Ed. 2d at 241, 103 S. Ct. at 2736.

The Supreme Court noted that the Georgia death penalty statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single such factor. Furthermore, the finding of an aggravating factor serves the purpose of narrowing the class of persons convicted of murder who are eligible for the death penalty; the finding of an aggravating factor does not guide the sentencing body in the exercise of its discretion. Moreover, the statute provides for meaningful appellate review of every death sentence to determine if the sentence was arbitrary or disproportionate. (462 U.S. at 874, 77 L. Ed. 2d at 248, 103 S. Ct. at 2741.) The Supreme Court held that as there were two valid aggravating factors which served to narrow the class of persons eligible for the death penalty, and as the State supreme court provided meaningful review of the sentence, the one invalid aggravating factor did not render the death sentence invalid. 462 U.S. at 879-80, 77 L. Ed. 2d at 251-52, 103 S. Ct. at 2743-44.

In Illinois, during the first phase of the sentencing hearing, the jury determines whether a defendant is eli-

gible for the death penalty. A defendant who has been found guilty of murder is eligible if: (1) he has attained the age of 18; and (2) the jury has found the existence of at least one aggravating factor. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b).) Like the Georgia statute, the Illinois statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single such factor. The finding of an aggravating factor serves the purpose of narrowing the class of persons convicted of murder who are eligible for the death penalty; the finding of an aggravating factor does not guide the jury in the exercise of its discretion. If the jury determines that a defendant is eligible for the death penalty, the jury then considers, during the second phase of the sentencing hearing, any aggravating and mitigating factors which are relevant to the imposition of the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), and determines whether there are mitigating factors sufficient to preclude the imposition of the death penalty (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(g), (h)). Finally, this court provides meaningful appellate review of every death sentence. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i).

In the instant case, during the first phase of the sentencing hearing, the jury found the existence of two aggravating factors: sections 9—1(b)(3) and (b)(7) (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(7)). Therefore, even if we were to assume that section 9—1(b)(7) was unconstitutional or inapplicable to the defendant—and we do not make any such finding on either question—the defendant was still eligible for the death penalty under section 9—1(b)(3). As noted above, the Illinois statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single such factor. Therefore, the jury's reliance on section 9—1(b)(7),

even if such reliance was improper, did not affect its finding that the defendant was eligible for the death penalty. During the second phase of the sentencing hearing, the jury was free to consider any relevant and reliable evidence in aggravation and mitigation, including the manner in which the defendant murdered his victim. *People v. Emerson* (1987), 122 Ill. 2d 411, 445; *People v. Owens* (1984), 102 Ill. 2d 88, 113.

*People v. Brownell* (1980), 79 Ill. 2d 508, and *People v. Adams* (1985), 109 Ill. 2d 102, are consistent. In *Brownell*, the trial judge found the existence of two statutory aggravating factors rendering Brownell eligible for the death penalty: (1) the victim was killed in the course of a felony (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)); and (2) the victim was an eyewitness against Brownell (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)). After the second phase of the sentencing hearing, the trial judge sentenced Brownell to death. On appeal, this court held that Brownell was eligible for the death penalty under the first factor, but not under the second. The court reasoned that any murder victim is potentially an eyewitness against the person who commits the murder; therefore, the legislature intended to limit this section "to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution." (*Brownell*, 79 Ill. 2d at 526.) The court remanded the cause for resentencing because the trial judge, during the second phase of the sentencing hearing, considered an aggravating factor which was not warranted by the evidence. *Brownell*, 79 Ill. 2d at 535-36.

In *Adams*, the prosecutor argued during the first and second phases of the sentencing hearing that Adams qualified for the death penalty, in part, because the victim was an eyewitness to the crime. This argument was

erroneous. (See *Brownell*, 79 Ill. 2d at 535-36.) The court remanded the cause for resentencing because the jury considered an aggravating factor which was not warranted by the evidence. *Adams*, 109 Ill. 2d at 128.

In *Brownell* and *Adams*, the sentencing body considered during the second phase of the sentencing hearing an aggravating factor which was not relevant to the imposition of the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c) (sentencing body shall consider any aggravating and mitigating factor relevant to the imposition of the death penalty).) In the instant case, even if the jury improperly relied on section 9—1(b)(7) to establish the defendant's eligibility for the death penalty, the jury was still free to consider, during the second phase of the sentencing hearing, the manner in which he killed nine-year-old Vernita Wheat.

The defendant next asserts that he was denied a fair sentencing hearing because the prosecutor, during closing arguments, characterized him as "an animal, searching out his prey for money and pure pleasure in murdering." The defendant failed to object to this statement; therefore, he waived this issue through procedural default. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-82 (Ryan, C.J., concurring in part and dissenting in part).) Even if the defendant had preserved this issue for review, the remark, although improper, would not rise to the level of reversible error. It is improper to characterize a defendant as an "animal," but we will not reverse unless the characterization substantially prejudiced the accused. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 39; *People v. Johnson* (1987), 119 Ill. 2d 119, 139-40.) In light of the overwhelming evidence introduced at the guilt and sentencing phases of the trial, we do not find that this isolated remark substantially prejudiced the defendant.

The defendant next asserts that he was denied a fair sentencing hearing because the jury was not instructed that if it did not impose the death penalty, the court would sentence him to mandatory natural life imprisonment. This court recently held:

"An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (*People v. Gacho* (1988), 122 Ill. 2d 221, 262.)

The new rule announced in *Gacho* was held to be prospective only. (*Gacho*, 122 Ill. 2d at 263; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43-44.) At the defendant's sentencing hearing, which took place before our decision in *Gacho*, the circuit court properly instructed the jury in accordance with existing law. See *People v. Stewart* (1984), 105 Ill. 2d 22, 71; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

The defendant argues that in light of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, the new rule announced in *Gacho* must be applied retroactively. *Griffith* held that decisions announcing new constitutional rules of criminal procedure are "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." 479 U.S. at 328, 93 L. Ed. 2d at 661, 107 S. Ct. at 716.

The defendant's argument is without merit. The right to a jury instruction on the alternative mandatory sentence of natural life imprisonment is a statutory, not a constitutional, right. (See *King v. Lynaugh* (5th Cir. 1988), 850 F.2d 1055; *O'Bryan v. Estelle* (5th Cir. 1983), 714 F.2d 365.) The new rule announced in *Gacho* is rooted in section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—

1(a)(1)(c); *Gacho*, 122 Ill. 2d.at 261), and its purpose is to clarify to the jury the statutory requirement that an individual convicted of multiple murders must be sentenced to natural life imprisonment if not sentenced to death. As *Griffith* is applicable only if the new rule is of constitutional dimension (*Griffith*, 479 U.S. at 328, 93 L. Ed. 2d at 661, 107 S. Ct. at 716; *People v. Erickson* (1987), 117 Ill. 2d 271, 289), and as the new rule announced in *Gacho* is only of statutory dimension, *Griffith* is not controlling.

Lastly, the defendant challenges the constitutionality of the Illinois death penalty statute. Each of his claims, however, has previously been resolved against him. The State is not required to prove the absence of mitigating factors beyond a reasonable doubt (*People v. Johnson* (1987), 119 Ill. 2d 119, 151; *People v. Kubat* (1983), 94 Ill. 2d 437, 504), and the death penalty statute does not place an impermissible burden of proof on the defendant to establish mitigating factors (*People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69). Moreover, the death penalty statute does not lack adequate safeguards to prevent the arbitrary or capricious imposition of the death penalty. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Albanese* (1984), 104 Ill. 2d 504, 540-42.) Finally, the entire capital sentencing scheme, in combination, does not render the process arbitrary or capricious. *People v. Jimerson* (1988), 127 Ill. 2d 12, 56.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters*, No. 88—2390. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same posi-

tion. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1071; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.

For the reasons set forth above, we affirm the defendant's convictions and sentence of death. We hereby direct the clerk of this court to enter an order setting Wednesday, November 15, 1989, as the date on which the sentence of death entered by the circuit court of Lake County shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of this mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*Affirmed.*