THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES EASTLAND et al., Defendants-Appellants.

First District (3rd Division)   Nos. 1—88—0839, 1—88—0840 cons.

Opinion filed December 29, 1993.—Rehearing denied January 28, 1994.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant Charles Eastland.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Charles and Peggy Eastland (defendants) were convicted of two counts each of aggravated kidnapping and deviate sexual assault, and one count of rape stemming from events occurring between February 3 and February 15, 1984.[1] Charles Eastland (Charles) was sentenced to concurrent terms of 60 years' imprisonment for rape and each of two counts of deviate sexual assault, and a 15-year term for both counts of aggravated kidnapping to run consecutively with

---

[1] The section of the Criminal Code concerning rape (Ill. Rev. Stat. 1983, ch. 38, par. 11—1(a)) was repealed in 1984 and replaced with the crime of aggravated criminal sexual assault. See Ill. Rev. Stat. 1991, ch. 38, par. 12—14.

the other sentences. Peggy Eastland (Peggy) was sentenced to concurrent terms of 25 years' imprisonment for rape and each of two counts of deviate sexual assault, and a 10-year term for both counts of aggravated kidnapping to be served consecutively.

On appeal Charles argues that: (1) his waiver of counsel was ineffective where the trial court failed to admonish him as to the possibility of the imposition of consecutive sentences; (2) the State's use on cross-examination of a paper which he wrote 10 years earlier prejudiced the jury; (3) he was not proven guilty beyond a reasonable doubt; and (4) the trial court erred in entering judgment for five offenses when the jury returned three verdicts.

Peggy joins in Charles' fourth argument and also contends that the State failed to prove beyond a reasonable doubt her responsibility in the rape or deviate sexual assault of the victim, Carla P. (Carla), a 22-year-old college student.

The State concedes that the trial court incorrectly entered judgment on one of the deviate sexual assault counts and one of the aggravated kidnapping counts for each defendant. Accordingly, we vacate these counts and, for the reasons which follow, affirm the remaining sentences of one count of rape, deviate sexual assault and aggravated kidnapping for each defendant.

On February 2, 1984, Carla filled out a job application at the junior college which she attended, the application having been distributed by a woman whom she later identified as Peggy. After Carla returned to her mother's home, where she also lived, she spoke on the telephone with Charles and arranged a meeting for the next day.

Carla testified that on February 3 Charles picked her up at her home and, after driving for several hours to different locations ostensibly for business purposes, at gunpoint ordered her to enter a one-story house. Charles then led her to a bedroom where he forced her to drink a green liquid which caused her to fall asleep.

When Carla awoke, she was on a bed in a different room with her arms and legs bound. Later, after again awakening, Charles was carrying her toward the basement of another building.

In the basement, defendants and a person identified only as "Bill" forced her to undress, bound and gagged her and then placed her in a wooden box which resembled a coffin. About an hour later Carla was taken out of the box and untied. While Peggy aimed the gun at her, first Bill and then Charles forced Carla to engage in vaginal intercourse, and then drink more of the green liquid.

When Carla awoke several hours later, she was bound and wrapped in plastic inside a blanket in a dirt hole under the pantry of the house.

Later, she was pulled by ropes through an opening from the hole into the pantry and carried into the bedroom where she was untied, ungagged and removed from the plastic and blanket such that she was naked. While Peggy sat on the bed, Charles asked her questions concerning business and other topics. If she did not respond, Charles would punch her in the face or the stomach.

After several hours of questioning, defendants again placed Carla in the hole, bound, gagged and wrapped in plastic and the blanket. This practice of binding Carla occurred after each of the many episodes of her removal from the hole, except sometimes she was given wine to drink but rarely anything to eat.

Defendants subsequently returned Carla to the bedroom to listen to Charles theorize about the "Black Generation" which would "end the race." Charles wanted Carla to become a part of the "Family" (the Family) which would attempt to hold the "Black Generation" (the Black Generation) together. Charles executed this dialogue with the handgun before him.

Another time, Charles forced Carla to engage in anal, oral and several acts of vaginal intercourse with him and various sexual acts with Peggy.

On two separate occasions, defendants forced Carla to write various letters including a request for membership in the "Family."

On or around Valentine's Day, Carla was removed from the hole for the purpose of informing her mother of her well-being by means of a writing and photographs of her holding that day's newspaper.

On February 15, 1984, Carla was again removed from the hole and carried to the bedroom where Charles unbound her and told her to put on her clothes in preparation for meeting her sponsor for membership in the Family. After Carla dressed, defendants tied her wrists, wrapped her in a blanket and drove her to a vacant lot. Charles handed Peggy the gun while he went to look for the sponsor, who never arrived. Upon their return, Charles held a gun in his lap while he, Peggy and Carla ate a meal in the bedroom. Peggy soon began to doze, but Charles woke her and directed her to take the gun so that she might guard Carla while he slept. Shortly thereafter, Peggy also fell asleep.

Carla then made her escape from the house with Peggy's driver's license, her car keys and other articles. She drove to a shopping center where she called her mother and then to her home, where she arrived visibly upset and with a swollen mouth and a number of bruises on her face and body as well as traces of adhesive tape on her face where a gag had been placed during her period of imprisonment.

Charles testified that he first met Carla in September 1983 when

he and a friend gave her a ride. The friend was not identified nor did he testify. On February 3, 1984, Carla recognized Charles in his car and offered to spend time with him. While they drove, Charles discussed the novel he was writing which seemed of interest to her.

Charles further stated that eventually they drove to the Eastland house so that Carla would have an opportunity to read the manuscript. Charles claimed that Peggy was not at home, having run away after becoming angry with him. When Carla later asked that she be driven home, Charles replied that he was too groggy to drive her but that she could spend the night at the house or a nearby hotel. Upon her refusal of either option, Charles allowed her to take his car, which she returned about three days later.

At that time, Carla again expressed interest in the novel and Charles hired her after testing her language skills by having her write three letters. Charles then requested she fill out a job application and in a *non sequitur* explained that this was necessary because he was then on parole for a Federal offense. Charles stated that he then gave Carla $500 as an advance for her work on the novel.

According to Charles' version of events, Carla stayed at the Eastland home from Monday through the next Friday to work on the novel. On Saturday morning, he claims that Carla made sexual advances toward him which he refused, and he chastised her without making physical contact.

The next morning Peggy returned to the Eastland home. When Charles identified Peggy as his sister, Carla called him a liar and drove off with his car.

On February 15 Charles asked a police officer, identified as a friend, how to retrieve his money and his car. He was advised that his car was at the police station where Carla and her mother were accusing him of rape. Charles then determined that it was best for him to quickly leave the jurisdiction since he was apparently on parole by reason of a Federal conviction. Charles and Peggy travelled to several cities outside Illinois before their arrest in Gary, Indiana, on March 19, 1985.

Peggy did not testify. However, defendants called several expert witnesses to testify concerning the properties of the green fluid and the absence of seminal material, as well as the treating nurse. No witness corroborated Charles' account.

■ Charles first argues that he did not intelligently and knowingly waive his right to counsel due to the trial court's failure to comply with Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)) at the beginning of his second trial, the first trial ending in a mistrial when

the jury was unable to come to agreement. Rule 401(a) provides that the court shall allow a defendant to waive counsel only after informing him of and determining that he understands: (1) the nature of the charge; and (2) the minimum and maximum sentence prescribed by law, including "the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences." (134 Ill. 2d Rules 401(a)(1), (a)(2).) Charles states that the court failed to inform him of the nature of the charges he faced with regard to the actual elements of the offenses as well as the possibility of consecutive sentences.

The court's failure during the second trial to specify that Charles could receive consecutive sentences does not amount to reversible error for several reasons. First, the record shows that Charles was informed of the "nature of the charges" against him. The court during the first and second trials explicitly advised Charles that he was charged with two counts of aggravated kidnapping and deviate sexual assault, and one count of rape. The fact that Charles was present throughout the entire first trial based on these charges and also vigorously and articulately represented himself during the second trial concerning the same facts indicates his awareness of the nature of the charges against him.

Charles was also informed of his eligibility to receive the various penalties which could have been imposed. At the first trial Charles expressly affirmed his understanding that he could spend the rest of his life in prison and at the second trial that he potentially faced "serious consequences" including a prison term of 30 to 60 years. In fact, Charles' presence during the first trial indicates his awareness of the minimum, maximum, extended or consecutive sentences available for his alleged crimes as well as the type and extent of the evidence that would be presented against him. Although the trial court failed to advise Charles of his eligibility to receive consecutive sentences at the second trial, the record reveals that he was aware of this possibility as well as the seriousness of the charges that he faced. See *People v. Johnson* (1987), 119 Ill. 2d 119, 131, 518 N.E.2d 100 (failure to admonish defendant in a capital case that potential maximum sentence was life imprisonment does not invalidate waiver of counsel); *People v. Coleman* (1989), 129 Ill. 2d 321, 544 N.E.2d 330.

In addition, Charles exhibited a high degree of legal sophistication perhaps gained from his presence throughout these proceedings, if not also his criminal history, so that his waiver of counsel was made knowingly and intelligently. (*Johnson*, 119 Ill. 2d at 131; *People v. Nieves* (1982), 92 Ill. 2d 452, 466, 442 N.E.2d 228; *People v. Smith* (1985), 133 Ill. App. 3d 574, 579, 479 N.E.2d 24 (no error in not

specifically admonishing defendant of Rule 401(a) where defendant possessed a degree of legal sophistication).) Before the second trial, Charles filed numerous *pro se* motions and petitions and submitted questions for and participated in *voir dire*. During the trial he raised numerous objections to evidence and presented his own opening and closing statements. He subsequently prepared and argued his motion for a new trial and argued extensively at the sentencing hearing. As the court observed, Charles demonstrated the potential to have become "one of the most effective defense attorneys known to the history of the legal profession."

Alternatively, were we to narrowly construe Rule 401(a) and determine that Charles was not given an appropriate admonishment as to consecutive sentences, the record shows that Charles received "technical assistance" of standby counsel at trial. (*Nieves*, 92 Ill. 2d 452, 442 N.E.2d 228; *People v. Bliey* (1992), 232 Ill. App. 3d 606, 617, 597 N.E.2d 830.) It is not relevant whether or not defendant actually availed himself of the services of standby counsel, or the extent to which standby counsel participated in the proceedings. (*Bliey*, 232 Ill. App. 3d at 618, citing *Johnson*, 119 Ill. 2d at 136.) A defendant who seeks to defend himself with the advice of counsel has the freedom of defending himself and deciding his own strategies in addition to the expertise of an advisor with legal training. (*Bliey*, 232 Ill. App. 3d at 617.) Therefore, such defendant should not be heard to complain on appeal of improprieties pertaining to admonishments about proceeding *pro se*. *Bliey*, 232 Ill. App. 3d at 617, citing *Smith*, 133 Ill. App. 3d at 579.

Charles denies that he received "technical assistance" and complains that the court imposed severe limitations on his appointed standby counsel (*i.e.*, counsel could not initiate questions while he examined witnesses, confer with him while on the stand during breaks at trial or talk with Peggy's attorney at trial). However, the record demonstrates that the trial court afforded Charles latitude in his *pro se* representation. The two assistant public defenders appointed as standby counsel were extremely familiar with the case having represented Charles during his first trial. The attorneys were to field questions about strategy, rules of evidence and court protocol, among other issues. Before the second trial, counsel provided Charles with a written outline setting out the basic steps of a jury trial. The trial court, over the State's objections, also provided Charles with the opportunity to offer an additional statement after he was cross-examined and before leaving the witness stand. Charles did not contest this arrangement. Instead, he agreed to the trial court's restrictions on the attorneys before trial such that they would not be

permitted to enter objections or "directly participate during any facet of the trial."

◼ Charles next argues that the State's cross-examination concerning a document called "Constitution Familia Regalia Eastland" (Regalia Familia) which he authored as part of a class project 10 years earlier was extremely prejudicial and required a new trial. However, the record shows that the trial court did not abuse its discretion in allowing the State to cross-examine Charles with regard to this document where it was relevant, although remotely so, to corroborate Carla's testimony and to establish the motive for her abduction.

Evidence is considered relevant if it tends to make any fact of consequence to the determination of an action more or less probable than it would be without the evidence. (*People v. Illgen* (1991), 145 Ill. 2d 353, 365-66, 583 N.E.2d 515.) Although Charles testified that he never discussed this particular document or its contents with Carla, a letter was admitted in evidence relating to Carla's application for membership in the Family as a "general." Carla testified that she had never heard of the Family prior to her abduction and could not have written the letter unless Charles had dictated it to her. Hence, Charles' earlier statements concerning the Regalia Familia tend to corroborate Carla's testimony that, as a female college student, she was kidnapped to strengthen the Family against the threat of the Black Generation.

Charles alternatively argues that even if the paper is relevant, the court should have precluded his testimony about the document to avoid prejudicing the jury against him due to his unpopular beliefs. A trial court has discretion to determine whether the probative value of evidence outweighs its prejudicial effect, and a reviewing court will not reverse such determination absent a clear abuse of discretion. (*Illgen*, 145 Ill. 2d at 375 (trial court did not err in admitting evidence of defendant's prior bad acts to prove intent and motive).) Although Charles did not mention the Family on direct examination, the court allowed the State to elicit on cross-examination only that he wrote a paper concerning the Regalia Familia which included a section on "generals." The rest of the document was not made the subject of the cross-examination nor testified to by Charles. Moreover, the contents of this paper were not published to the jury.

◼ Charles next contends that insufficient evidence was adduced to prove him guilty beyond a reasonable doubt of the offenses charged since: (1) Carla's tests for seminal material registered negative as did her clothes and the plastic sheet allegedly wrapped around her during her captivity; (2) there was no waste material observed on Carla's

body nor any signs of dehydration or malnutrition; and (3) a chemistry expert testified that the green fluid which Carla claims to have induced sleep contained table sugar and could possibly have been Kool-Aid.

It is clear that the State is no longer required in sex offense cases to demonstrate that the victim's testimony be substantially corroborated to prove guilt beyond a reasonable doubt. (*People v. Schott* (1991), 145 Ill. 2d 188, 202-03, 582 N.E.2d 690 (sex offense victim's testimony need not be found clear and convincing or substantially corroborated to uphold conviction on appeal); *People v. Riley* (1991), 219 Ill. App. 3d 482, 490, 579 N.E.2d 1008; *People v. Mitchell* (1991), 215 Ill. App. 3d 849, 576 N.E.2d 78; *People v. Byrd* (1990), 206 Ill. App. 3d 996, 1006, 565 N.E.2d 176; *People v. James* (1990), 200 Ill. App. 3d 380, 394, 558 N.E.2d 732.) The appropriate standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Schott*, 145 Ill. 2d at 203, citing *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 266.) When a defendant charged with a sex offense challenges the sufficiency of the evidence, a reviewing court will not reverse a conviction unless the evidence is so "improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Schott*, 145 Ill. 2d at 203, citing *Collins*, 106 Ill. 2d at 261.

The record at hand shows that the State satisfied its burden of proving Charles guilty of all offenses charged. First, the record shows that Carla not only identified Charles and Peggy Eastland by name, but that she also selected Charles' photo from a series of mug shots provided at the police station. Carla also described and later identified the house where she had been kept, which the police determined as belonging to the Eastlands.

Carla's version of the events of February 1984 is further corroborated by the police identification of the two-by-four-foot dirt hole under the pantry of the house and the presence of the plastic and blanket allegedly wrapped around her during this period. At the police station, Carla gave the police items relevant to the case, such as: (1) a car registered in Peggy's name at the address of the Eastland house; (2) photographs of Carla in an abused state; (3) various writings including a letter of "complaint," "thanks" and "request" and a poem written for Carla's mother; (4) a job application written by Carla; and (5) Peggy's driver's license.

At the Eastland house, the police located the rear bedroom based on Carla's description and recovered personal items left by her such as her gloves and other items with her name affixed upon them, as

well as other objects relevant to the case such as a tumbler which allegedly contained the green fluid. Regarding this fluid in particular, an expert chemist testified that any alcohol present in what remained of the liquid in the tumbler would have evaporated by the time he received the sample and he did not test for other substances.

In response to Charles' challenges to her testimony of the abduction, Carla states that no evidence of waste material was found on her person because she had bathed at her mother's home, and no such evidence was found on or about the plastic since: (1) she was not given anything to eat and little to drink; (2) in the hole, she did not have any clothes on which could have absorbed or retained the waste or caused an odor; and (3) the police searched defendants' home two days after her escape so there was ample opportunity to clean the entire area. With regard to the question of whether she suffered from malnutrition or dehydration, the treating nurse testified that she had no opinion as to whether Carla suffered from these maladies because no tests were performed to make such a determination.

The record further corroborates Carla's account of her physical abuse by eyewitness testimony from her mother, the police officer assigned to the case, the treating nurse and police officers at the station who photographed her, depicting her blackened eye and swollen and bruised face. These photos also depict places where her skin had been torn off from adhesive tape. The photographs which Charles identified at trial as photographs he had taken of Carla also show her swollen face resulting from his punches and slaps, and swollen lips due to a gag and traces of adhesive tape placed around her mouth.

In addition, the record provides evidence of Carla's sexual abuse. Although Charles testified that he never made physical contact with Carla or detained her against her will, one rebuttal witness stated that around March 19 or 20, 1985, he was in a jail cell next to Charles, who recounted how he had committed deviant sexual acts against a woman whom he had also forcibly detained. Another rebuttal witness who was a police officer testified that on March 20, 1985, Charles told him how he met a girl with Carla's first name at the junior college at issue a few weeks earlier and that they had been dating, talked of marriage and travelled to a motel to have sexual relations. With regard to the negative tests for seminal material, the scientist who received the test results testified that she would not expect to find evidence of seminal material 7 to 10 days after sexual intercourse since such material is usually detectable if a sample is collected within 72 hours.

■ Peggy also contends that she was not proven guilty beyond a

reasonable doubt due to the lack of evidence of her accountability in the rape and deviate sexual assault of Carla. However, the record clearly implicates Peggy at all essential moments of Carla's abduction. Specifically, Peggy passed out job applications at the junior college as a pretense for gaining access to young women in furtherance of a scheme to abduct them. Peggy also participated in conducting Carla to and detaining her in the various spaces where she would be subjected to abusive and sexual assaults such as the basement of the building where the first sexual assault occurred and the bedroom of the Eastland home. Finally, Peggy was present and helped achieve the first sexual assault since she aimed the gun at Carla and then actively and directly participated in the second sexual assault. In our review of the evidence concerning Peggy's involvement in the rape and deviate sexual assault of Carla, this court does not find such information so "improbable or unsatisfactory" as to overturn the jury's determination of Peggy's accountability beyond a reasonable doubt. See *Schott*, 145 Ill. 2d at 203.

■ Finally, both defendants contend that the trial court erred in entering judgment on five offenses when the jury returned a guilty verdict for only three offenses. Peggy also contends that her case should be remanded for resentencing. The State agrees that the trial court incorrectly entered judgment on one of the deviate sexual assault counts and on one of the aggravated kidnapping counts for each of the defendants. A court cannot impose a sentence for an offense which did not result in a conviction by a jury. (*People v. Clark* (1984), 124 Ill. App. 3d 14, 24, 463 N.E.2d 981; see *Riley*, 219 Ill. App. 3d at 493.) Hence, this court will vacate the appropriate convictions for each defendant and affirm both defendants' convictions for rape, deviate sexual assault and aggravated kidnapping. However, Peggy's case need not be remanded for resentencing since the record does not indicate that the additional charges were considered by the sentencing court. *People v. Hood* (1989), 191 Ill. App. 3d 129, 134, 547 N.E.2d 637; see *People v. Myers* (1980), 83 Ill. App. 3d 1073, 1077, 404 N.E.2d 1082.

For the foregoing reasons, we vacate one count of deviate sexual assault and one count of aggravated kidnapping for each defendant, and affirm each defendant's sentences for rape, deviate sexual assault and aggravated kidnapping.

Affirmed as modified.

TULLY, P.J., and RIZZI, J., concur.