# Illinois Official Reports

## Appellate Court

> ### *People v. Wright*, 2015 IL App (1st) 123496

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EUGENE WRIGHT, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-3496 |
| Filed<br>Rehearing denied | May 21, 2015<br>June 24, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-13186; the Hon. Timothy Chambers, Judge, presiding. |
| Judgment | Reversed and remanded with instructions. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Peter Sgro, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Samuel C. Ray, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE COBBS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Eugene Wright was convicted of four counts of armed robbery while armed with a firearm pursuant to section 18-2(a)(2) of the Criminal Code of 1961 (the Code) (720 ILCS 5/18-2(a)(2) (West 2010)) and sentenced to 50 years in prison. On appeal, defendant asserts: (1) his due process rights were violated when the State secured his indictment for armed robbery with misleading testimony; (2) the trial court failed to properly admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984); (3) the trial court improperly excluded codefendant's statement that codefendant committed the crime with a BB gun; (4) the State failed to prove him guilty beyond a reasonable doubt of armed robbery while armed with a firearm; and (5) the trial court erred by failing to instruct the jury on the definition of a firearm. We reverse defendant's conviction and remand his case for a new trial.

¶ 2                                              BACKGROUND

¶ 3    The State charged Eugene Wright and codefendant Michael Morgan, who is not a party to this appeal, by indictment with four counts of armed robbery with a firearm in connection with a December 26, 2010, robbery at a Baker's Square restaurant located at 7131 North Western Avenue in Chicago. Defendant was originally indicted under No. 11 CR 928 on January 10, 2011, when Officer Tracy Walczak provided inaccurate testimony that three witnesses identified defendant at the show-up when only one witness identified him. As a result of the inaccurate testimony, the State reindicted defendant under No. 11 CR 13186 and ultimately nol-prossed the original indictment.

¶ 4    At the August 15, 2011, grand jury proceeding, Detective Allen Lee testified that he investigated the Baker's Square robbery. He stated that defendant and codefendant walked into the restaurant and codefendant announced a robbery. After taking the money from the safe, defendant and codefendant exited. Codefendant used a handgun during the robbery but disposed of the weapon before he was apprehended after leaving the restaurant. Detective Lee stated that a weapon was never recovered. Detective Lee also testified that defendant was identified as a perpetrator by one eyewitness and Officer Cirrincione, who had been staking out the restaurant. The grand jury returned a true bill for armed robbery with a firearm.

¶ 5    On February 7, 2011, defendant was arraigned. Initially, defendant was represented by a public defender. However, after the public defender sought a continuance to order discovery, defendant said he wanted to hire his own attorney and the case was continued until February 24, 2011. On February 24, 2011,[1] defendant indicated that he wished to proceed *pro se*. The trial court informed defendant that he had a right to an attorney, but the court would not appoint counsel other than the one from the public defender's office. The court admonished defendant that he was charged with two different cases of armed robbery and that he could

_____

[1] Although Judge Timothy J. Chambers presided over the jury trial and sentencing in the proceedings, Judge Lauren Edidin was the presiding judge during the February 24, 2011, hearing in which defendant was initially admonished pursuant to Rule 401(a) and Judge William T. O'Brien presided over the March 1, 2011, proceeding in which defendant was again admonished.

possibly be sentenced to consecutive sentences with a range of 21 to 45 years in prison for each conviction.[2] The State informed the court that defendant was eligible for a maximum sentence of 60 years in prison because of his criminal background, and the court then admonished defendant that he could be eligible for an extended-term sentence with a maximum range of 60 years in prison. Defendant confirmed that he wanted to proceed *pro se*.

¶ 6    The court admonished defendant again on March 1, 2011. The court informed defendant that he was not eligible for consecutive sentences, but based on his criminal history and the use of a handgun during the offense, he faced a concurrent sentence of 21 to 60 years in prison. Defendant stated that he had completed two years of college and had experience with the criminal justice system, and the court allowed defendant to proceed *pro se*. The following evidence was adduced at trial.

¶ 7    On December 26, 2010, shortly before 11 p.m., codefendant, wearing a gray hoodie, a white hat, jeans, and gym shoes, entered the Baker's Square located at Touhy and Western and asked server Michael Morina if they were still selling pies. Morina went to the back of the restaurant to find the manager, Martin Perez, and told him that a customer wished to place a to-go order. Perez testified that he went to the front counter and asked codefendant what he needed and codefendant turned around and lifted his hoodie to reveal what Perez thought "looked like a black automatic, black gun" tucked into his waistband, and stated "[t]his is a robbery; take me to the office." Perez was sure codefendant's gun was an actual firearm as he had seen guns like that in Mexico. Defendant, wearing a black hoodie, blue jeans, and a black headband, entered the restaurant and approached the counter. Codefendant followed Perez into the office. Perez "felt something sharp in [his] back" as he walked which he stated was the barrel of the gun. Perez had previously received e-mails that two black men, about 6 feet tall, had robbed other Baker's Square restaurants and he thought these men might be the ones about whom he had been warned.

¶ 8    In the office, codefendant ordered Perez to open the safe and give him the money inside. Perez unlocked the safe and gave codefendant a deposit bag marked "Baker's Square" and some loose bills from an extra cash drawer. After receiving the money, codefendant told Perez to gather all his employees. Perez asked Martin, Morina, Tsehayens Tsegaye, a waitress, and Leo Martinez, a cook, to come near the kitchen. Codefendant asked the employees to throw their cell phones into a garbage can. He told Morina to stop looking at him and demanded his tip money. After Morina gave codefendant his tip money, codefendant ordered all of the employees into the walk-in cooler and told them to wait there for five minutes before exiting. Once codefendant and defendant left, Perez pulled the alarm inside of the cooler. After two or three minutes, Perez and Morina exited the cooler, leaving Tsegaye and Martinez inside. Perez then went to the office and called 911.

¶ 9    Tsegaye and Morina testified in a manner consistent with Perez. Tsegaye added that when she asked defendant why he wanted her to throw away her cell phone, codefendant grabbed her arm, pulled up his shirt, showed her a gun in his waistband and told her that "you're being robbed." Tsegaye could only see the handle of the gun. Morina testified that he also observed the handle of defendant's gun and believed it to be a "9 millimeter pistol."

---

[2]Defendant was also charged in a related case with six counts of armed robbery with a firearm of a Baker's Square located at Foster and Harlem on December 11, 2010.

¶ 10    Chicago police officers Paul Cirrincione, Tracy Walczak, and Sergeant Lewadowski were assigned to conduct surveillance of the Baker's Square at Western and Touhy. The officers received this assignment because the Baker's Square at Harlem and Foster in Chicago had been previously robbed near closing time. The officers were told that the previous robbery had been carried out by two black males in their late twenties and early thirties, one wearing a gray vest and the other a dark hoodie, and that they used a black van with tinted windows as the getaway car. Around 11 p.m., the officers observed two black males, fitting the description of the suspects from the previous robbery, exit the restaurant. The officers later identified these men as defendant and codefendant. After the men exited the Baker's Square, they looked around and then walked "very fast" southbound on Western Avenue, and then turned eastbound onto Estes Avenue. Based on these observations, the officers drove their car through the parking lot toward defendant and codefendant and asked the men to come over. As the officers got out of their squad car, the men looked at them and then fled.

¶ 11    Officer Walczak chased codefendant on foot while Officer Cirrincione drove the squad car through an alley behind the mini-mall in an attempt to cut him off. Officer Cirrincione exited his squad car and chased codefendant on foot. During the chase, a radio call came in that the Baker's Square had been robbed. Officer Cirrincione alerted other officers in the area via radio that he was chasing codefendant. Officer Cirrincione chased codefendant until codefendant slipped in front of a house at 2322 West Greenleaf and Cirrincione grabbed him. The two men wrestled until Sergeant Lewandowski and Officer Gremo arrived and helped place codefendant into custody. Officer Gremo searched codefendant's pockets and recovered a deposit bag labeled "Baker's Square," containing cash, and a separate large bundle of loose cash. After a search of the area where codefendant was detained, officers were unable to locate his gun, noting the large amount of snow on the ground.

¶ 12    After codefendant was detained, Sergeant Lewandowski returned to the Baker's Square. On the way there, he saw a large black conversion van with tinted windows traveling southbound on Western Avenue matching the description of the van used in the previous Baker's Square robbery. He radioed that a black van with tinted windows and a low-hanging muffler was traveling south on Western, and that it was possibly involved in a robbery. The van was located by Officer Eric Killion after he heard the call. Killion curbed the van, took defendant out of the van and handcuffed him. Killion did a quick search of defendant and the van for weapons, but he did not find any.

¶ 13    Officer Michael Chuchro also responded to the call and put defendant in his squad car. Chuchro searched the van and did not see a weapon, but saw several rolls of coins on the floor between the front seats. Officer Nester DeJesus stayed with the van while Chuchro and his partner, Officer Accardo, took defendant to the Baker's Square parking lot for a show-up identification. Officer Lewandowski was inside the restaurant with the witnesses for the show-up. Lewandowski testified that Perez, Morina, and Tsegaye each individually identified codefendant as one of the offenders. Although Perez identified defendant as the second offender, Morina and Tsegaye did not view defendant because they did not get a good look at the second offender. After the show-up, the men were arrested and taken to the 24th District police station. Officer Chuchro returned to where DeJesus had secured the van and drove it to the police station garage, where Officers Carden and McGovern searched the van and recovered four rolls of dimes and two rolls of quarters next to the driver's seat and a gray vest from the backseat.

¶ 14 Detective Lee, who provided testimony at the August 15, 2011, grand jury proceeding, testified that he went to the Baker's Square at about 12:30 a.m. on December 27, 2010, to investigate the robbery. He interviewed Perez and watched the Baker's Square surveillance video. Detective Lee went to the 24th District station and viewed surveillance photographs of the Harlem and Foster Baker's Square robbery. He inspected the black van and saw a gray vest in the backseat that looked similar to a vest worn by one of the suspects in the Harlem and Foster Baker's Square robbery. Detective Lee had codefendant put the vest on and took a picture of him, which was introduced into evidence.

¶ 15 On cross-examination, defendant asked Detective Lee about his grand jury testimony. Specifically, defendant asked whether he told the assistant State's Attorney that a weapon had never been recovered in connection with the robbery. Detective Lee testified that a weapon had not been recovered "on that date of the incident." However, he noted that on January 2, 2011, a black Crossman BB gun was observed by a citizen lying in the street in the vicinity where one of the offenders was running. On January 15, 2011, Detective Lee submitted an evidence report requesting to have the gun tested for fingerprints to link the weapon with one of the two offenders. Defendant asked Detective Lee about the photographs contained within the evidence technician's report that showed where the BB gun was recovered and moved to enter them into evidence. The court asked defendant if he knew who took the photographs and when they were taken. Defendant said he did not know, and Detective Lee said he had never seen the photographs before. After the court told defendant that he could not ask about the photographs, defendant moved that his case be dismissed on the grounds that "the State violated the *Brady* Rule by not submitting these pictures to me."

¶ 16 At a sidebar conference, the assistant State's Attorney informed the court that he had not seen the photographs in question but admitted that he had tendered the reports regarding the BB gun being discovered on January 2, 2011. The assistant State's Attorney explained that the gun was submitted for fingerprints, but it had not yielded any suitable fingerprints for comparison to codefendant. Defendant argued that in addition to a *Brady* violation, Detective Lee had deceived the grand jury when he testified that no weapon was recovered when he knew that the BB gun had been found. In response to the assistant State's Attorney's comment that there was no proof that the BB gun was used in the robbery, defendant made an offer of proof that Detective Lee would testify that codefendant said he committed this crime with a black BB gun. However, defendant acknowledged that the statement was hearsay, and he needed "the actual person" to testify. The State asserted that if defendant tried to elicit codefendant's statement, it would elicit that codefendant also said he committed this crime with defendant. Defendant responded that he had no problem with eliciting codefendant's full statement. The trial court denied defendant's motion to dismiss the indictment based on a *Brady* violation.

¶ 17 After the motion was denied, the following exchange took place:

"THE DEFENDANT: Then I'm asking a motion in alignment to dismiss charges because the State knowingly deceived the Grand Jury when Detective Lee was asked was a weapon ever recovered.

THE COURT: Well, as I heard Detective Lee, he was asked if a weapon was recovered that night. So based on that, I would deny the motion.

THE DEFENDANT: I'm reading from the transcript. The statement was never from that night. The statement–

THE COURT: That's how he heard it.

THE DEFENDANT: That's amazing.

THE COURT: Well, let's go back in court. The motions to dismiss are denied. It was not a *Brady* violation."

¶ 18 After the sidebar, defendant continued with his cross-examination of Detective Lee:

"THE DEFENDANT: Do you remember doing an interview with [codefendant]?

DETECTIVE LEE: I did, yes.

THE DEFENDANT: And do you remember–

ASSISTANT STATE'S ATTORNEY: I'm going to object, Judge. This is the codefendant.

THE COURT: I will sustain it. We are not going to go into the statement, the nature of the conversation with [codefendant]."

¶ 19 The State then presented testimony relating to the December 11, 2010, Baker's Square robbery at Foster and Harlem, and the jury was instructed to consider the other-crimes evidence only for identity and *modus operandi*.

¶ 20 Following the State's presentation of testimony, the court held a hearing on the record outside of the presence of the jury. During the hearing, the court placed codefendant under oath and he invoked his right not to testify pursuant to the fifth amendment. Defendant then told the court: "I would still like to call him and allow the jury to hear him plead–I still have questions and he can plead out on it." The State objected. The court sustained the objection and stated that it would not call codefendant in the presence of the jury "solely for the purpose of asserting his Fifth Amendment privilege." The State rested in the presence of the jury, and defendant proceeded with his case-in-chief.

¶ 21 Defendant called Perez, the manager of the Baker's Square on Touhy and Western, to testify. Perez maintained that although he could only see the handle of the gun, he was "100% sure" codefendant's gun was "an actual firearm." Defendant then showed Perez a photo of the BB gun recovered near the Baker's Square a week after the robbery and asked him if the BB gun looked like the gun used in the robbery, and Perez stated that "[he] couldn't tell."

¶ 22 Defendant testified on his own behalf that on December 26, 2011, he was driving south on Western when police stopped his van near Western and Pratt. He was taken out of his car and searched, and then taken to Baker's Square for a show-up identification. Defendant admitted that he was convicted of robbery in 2000 and sentenced to nine years in prison. He stated that in December 2010, he was living in Atlanta, Georgia, but was staying with a friend at 6331 South Sangamon in Chicago. Before he was stopped by police, he had dropped his friend off at Howard and Clark on the north side of Chicago. Defendant denied waiving his *Miranda* rights. He also denied telling an assistant State's Attorney and a detective that he had gone to 7300 North Bell Avenue to meet a woman he met on an adult website but she was not at home. Further, defendant denied that he knew codefendant. He stated that he did not have a roll of quarters or dimes in the van.

¶ 23 The State called Detective Lee and Assistant State's Attorney Sean O'Callaghan in rebuttal. Detective Lee testified that on December 27, 2011, at 2:40 a.m., he interviewed defendant at a police station after defendant waived his *Miranda* rights. Defendant told him

that, prior to being stopped, he went to the 7300 block of North Bell to meet a girl that he met on an adult sex website, but the girl had given him a "bogus" address. Defendant did not say that he dropped a woman off at Howard and Clark.

¶ 24    Assistant State's Attorney O'Callaghan testified that he was working in the felony review unit on December 27, 2011, and that in the early morning hours he went to the police station in regard to defendant's armed robbery. At approximately 5 a.m., he and Detective Lee read defendant his *Miranda* rights and interviewed him. Defendant also told him that he was stopped by police after he went to visit a woman named Lakesha, who lived on the 7300 block of North Bell, but no one was home.

¶ 25    Following arguments, the jury was tendered verdict forms on armed robbery and robbery.[3] The jury found defendant guilty of armed robbery. Defendant stated that he wished to represent himself for his posttrial proceedings and sentencing, and then filed a number of *pro se* posttrial motions. When the trial court asked defendant if he wished to address his motion for a new trial, defendant responded, "I'll deal with it on the appellate level." The court denied all of defendant's posttrial motions.

¶ 26    During defendant's sentencing hearing, the State presented aggravating evidence that defendant committed an armed robbery of a Baker's Square in Alsip, Illinois, on December 20, 2010. The State also presented evidence that on September 17, 2010, Officer Brandon Smith stopped defendant in a car after a traffic violation. According to Officer Smith, defendant refused to stop his vehicle and his passenger jumped out of the car and fled. Defendant and the passenger were eventually apprehended, and his passenger had a loaded AK-47 assault rifle. Defendant told Officer Smith that he did not know the passenger had a gun. Defendant then stated that if he himself had had a gun, Officer Smith would have ended up like the officer on 75th Street. Officer Smith informed the court that a week prior to the traffic stop an officer had been shot on 75th Street.

¶ 27    The State also presented certified copies of defendant's three prior convictions for robbery, including an armed robbery in 1994, for which defendant was sentenced to nine years in prison. Because the 1994 conviction was within 10 years of the instant offense, excluding time spent in custody, the State asserted that defendant was eligible for an extended-term sentence of up to 75 years in prison. The trial court sentenced defendant to an extended term of 50 years in prison. Defendant appealed.

¶ 28                                ANALYSIS
¶ 29                          Grand Jury Proceedings
¶ 30    We first address defendant's argument concerning the validity of his indictment. Defendant contends that the indictment charging him with armed robbery with a firearm was based on misleading testimony and, therefore, the trial court erred by denying his motion to dismiss the indictment. According to defendant, Detective Lee provided inaccurate testimony that no weapon was recovered in connection with this crime, when in actuality a BB gun was

---

[3]At the jury instruction conference, the State noted defendant's introduction of the BB gun and asked for an instruction on the lesser included offense of robbery. Prior to agreeing to the instruction, the court explicitly noted that "the gun in question has not been tied to this case, it's not been identified by anyone as being in the Baker's Square in the possession of [codefendant] or anyone else; indeed it's not tied to any person at all."

later recovered in the area where the codefendant fled the scene. Defendant maintains that had Detective Lee informed the grand jury about the BB gun, "there is a good chance the grand jurors would have not found the element of a firearm and not have indicted defendant on armed robbery with a firearm" because a BB gun is excluded from the definition of firearm for purposes of the Code. 720 ILCS 5/2-7.5 (West 2010); see also 430 ILCS 65/1.1 (West 2010) (definition of "firearm" in the Firearm Owners Identification Card Act).

¶ 31      The State contends that defendant forfeited this issue because he failed to preserve the issue in his posttrial motion. We disagree. To preserve an alleged error for appeal, a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27. The failure to object at trial or file a posttrial motion alleging an issue constitutes forfeiture of that issue on review. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). It is required only that specific issues be raised at trial and in a posttrial motion in order to give the trial court an opportunity to correct the error claimed. See *People v. Hope*, 184 Ill. 2d 39, 45 (1998).

¶ 32      We find that defendant properly preserved this issue for review. First, during trial defendant made an oral motion to dismiss the indictment on the grounds that Detective Lee provided deceptive testimony to the grand jury. Second, the State is correct that defendant's posttrial motion for a new trial alleged that the trial court erred when it denied a "pretrial motion to dismiss the indictment," when in fact the motion to dismiss the indictment based on Detective Lee's testimony was made mid-trial. However, we note that in a different section of the posttrial motion for a new trial, defendant specifically alleged that "the Court erred when it sustained objections made by the State to questions asked of witnesses by the Defendant, if the weapon used could have been fake, did detective Lee have knowledge of a b.b. [*sic*] gun being found before he went to the grand jury in August 2011." Therefore, because defendant specifically referenced the claim in his motion for a new trial, we find that the issue was adequately preserved on appeal. See *People v. Heider*, 231 Ill. 2d 1, 18 (2008) ("where the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal, *** there was no forfeiture").

¶ 33      A grand jury "determines whether probable cause exists that an individual has committed a crime, thus warranting a trial." *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998). The State advises the grand jury by informing it of the proposed charges and pertinent law. *Id.* Challenges to grand jury proceedings are limited, and a defendant may not challenge the validity of an indictment returned by a legally constituted grand jury or seek to challenge the sufficiency of the evidence if some evidence was presented. *People v. Reimer*, 2012 IL App (1st) 101253, ¶ 26. "In reviewing challenges to an indictment, courts will generally limit consideration to the transcript of the grand jury proceedings." *DiVincenzo*, 183 Ill. 2d at 255 (citing *People v. Linzy*, 78 Ill. 2d 106, 109 (1979)). Still, a trial court may dismiss an indictment if the defendant establishes that he suffered a prejudicial denial of due process. *People v. Oliver*, 368 Ill. App. 3d 690, 694 (2006). The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence. *DiVincenzo*, 183 Ill. 2d at 257. The State's presentation of deceptive evidence may violate due process "regardless whether the deception was intentional." *Oliver*, 368 Ill. App. 3d at 696.

¶ 34      Furthermore, the defendant must show that the denial of due process is "unequivocally clear" and resulted in prejudice that is "actual and substantial." *Id.* at 694-95. A due process

violation is actually and substantially prejudicial only if without it the grand jury would not have indicted the defendant. *Id.* at 696-97. Where, as here, the facts about what transpired at the grand jury proceeding are undisputed, we apply a *de novo* standard of review. *People v. Legore*, 2013 IL App (2d) 111038, ¶ 23.

¶ 35    We note that during trial, defendant moved to dismiss the indictment on the grounds that Detective Lee testified falsely to the grand jury by saying that no weapon was recovered. However, the trial court denied the motion, stating that Detective Lee interpreted the question as whether a weapon was found the night of the incident. We acknowledge that it is unclear from the record whether the court solely relied on the transcripts of the grand jury proceeding; however, we reiterate that the courts' role in reviewing grand jury proceedings is extremely limited. Courts may dismiss an indictment that is based solely on perjured or otherwise incompetent evidence, but they are not to scrutinize the proceedings to evaluate the weight and quality of the evidence. Therefore, we presume that the trial court's decision not to inquire further into Detective Lee's grand jury statement was informed by the limitation. We emphasize that this court is similarly limited, and thus our review of whether the trial court erred in dismissing the indictment is confined to the transcripts of the grand jury proceedings. See *DiVincenzo*, 183 Ill. 2d at 255. We now turn to the merits of this claim.

¶ 36    Defendant relies on *People v. Oliver*, 368 Ill. App. 3d 690 (2006), to support his contention that the trial court erred by denying his motion to dismiss the indictment. In *Oliver*, the defendant was indicted on two counts of unlawful possession of a controlled substance with the intent to deliver and one count of unlawful possession. *Id.* Based on the false and misleading testimony of a detective before the grand juries, the trial court dismissed two counts of the indictment (the possession with intent to deliver counts), and the State appealed. *Id.* at 690-91. The detective was the sole witness to testify during the two grand jury proceedings. *Id.* During the first grand jury proceeding, the detective explicitly stated that he observed the events, which were hand-to-hand transactions between the defendant and other individuals at an apartment that was under police surveillance because of prior drug activity. *Id.* at 691, 695. The detective did not observe the events, but relied on the report of another police officer eyewitness. *Id.* at 694. During the second grand jury proceeding, though the detective did not explicitly say so, he testified as if he were conveying his own personal observations rather than those of the actual eyewitness. *Id.* at 695. Based on this testimony, the court concluded that the State presented the grand juries with deceptive or inaccurate evidence and, as a result, denied the defendant due process. *Id.*

¶ 37    The *Oliver* court then focused its review on the issue of prejudice, noting that a due process violation was actually and substantially prejudicial only if without it the grand jury would not have indicted the defendant. *Id.* at 696-97. The court noted that if the only defect in the detective's testimony was that its hearsay nature was concealed, the defendant would not be able to show actual and substantial prejudice. *Id.* at 697. However, the court believed that the detective's testimony was "doubly" deceptive because it went beyond the hearsay issue in that it mischaracterized the observations of the actual police eyewitness so as to establish probable cause where none existed. *Id.* First, the detective testified that the defendant's hand-to-hand transactions would lead him to believe that the defendant intended to deliver the cocaine that he was found later to possess, despite the fact the officer actually witnessing the exchange "never saw what was exchanged in those transactions and thus had no basis to draw that inference." *Id.* Second, the detective's testimony that the defendant

engaged in several transactions was misleading, where the defendant only engaged in two transactions. *Id.* Finally, the amount of cocaine found on the defendant did not support a reasonable inference that he had the intent to deliver, despite the detective's testimony that the amount of cocaine would lead him to believe that the defendant intended to deliver the cocaine. *Id.* at 698. The *Oliver* court held that but for the detective's mischaracterization of the eyewitness's observations, the grand juries could not have found probable cause to indict the defendant for unlawful possession of a controlled substance with the intent to deliver. *Id.* at 698-99. Therefore, the due process violation was actually and substantially prejudicial. *Id.* at 699.

¶ 38    In this case, we do not find that Detective Lee's grand jury testimony amounts to an "unequivocally clear" denial of defendant's due process rights such as the case in *Oliver*. During the second grand jury proceeding, Detective Lee gave testimony that defendant and codefendant robbed a Baker's Square restaurant at 7131 North Western Avenue. After taking the money from the safe, the men left the store. Codefendant used a handgun during the robbery, but disposed of the weapon before he was apprehended after leaving the restaurant. Detective Lee stated that the weapon was never recovered. However, at trial he stated that a week later a BB gun was recovered in the area where defendant fled. Because there is no evidence that the BB gun was ever connected to the case, Detective Lee provided, at best, incomplete testimony to the grand jury that no gun was recovered in connection with the crime. Thus, we do not find that Detective Lee's grand jury testimony rose to the level of a due process violation as, factually, no gun had been recovered and specifically linked to the robbery.

¶ 39    Although defendant argues that there is a "good chance" that the outcome of the proceedings would have been different had Detective Lee presented testimony of the BB gun, we cannot say with any certainty that the omitted testimony actually and substantially prejudiced defendant. See *Oliver*, 368 Ill. App. 3d at 698-99. Specifically, defendant fails to show that the grand jury would not have otherwise found probable cause to indict defendant for armed robbery had Detective Lee testified that a BB gun was recovered a week later in the vicinity that the codefendant fled. Defendant concedes that the BB gun was submitted for fingerprints, but it had not yielded any suitable fingerprints for analysis. Therefore, had Detective Lee mentioned the BB gun during the proceeding, he would have also been obliged to inform the grand jury that the gun was submitted for fingerprint analysis, but there was no evidence linking the BB gun to either defendant or codefendant.

¶ 40    Furthermore, we find that Detective Lee's testimony was otherwise sufficient to secure an indictment for armed robbery. As our supreme court has previously held, an indictment will withstand scrutiny if the transcript of the grand jury proceedings reveals that "some evidence relative to the charge" was presented to the grand jury. *People v. Rodgers*, 92 Ill. 2d 283, 290 (1982); see also *People v. Whitlow*, 89 Ill. 2d 322, 331 (1982) (holding that if there is some evidence presented to the grand jury from which defendant's illegal conduct can be inferred, the reviewing court will not inquire into the "adequacy of the evidence"). "Some evidence" does not mean that the State must present the grand jury with evidence as to each element of the offense, but rather means that the evidence submitted must be such that it "tends to connect the accused to the offense charged." *Rodgers*, 92 Ill. 2d at 290. This evidence which connects may be any direct or circumstantial evidence from which an

- 10 -

inference of criminal conduct can be derived. *People v. Williams*, 383 Ill. App. 3d 596, 631 (2008) (quoting *People v. Edwards*, 243 Ill. App. 3d 280, 285 (1993)).

¶ 41    In this case, applying the applicable standard of proof enunciated by our supreme court, we find that there was some evidence presented to the grand jury which tended to connect defendant to the crime of armed robbery with a firearm with which he was charged. A review of the proceedings' transcript reveals that Detective Lee testified that he investigated the Baker's Square robbery. Based on his investigation, codefendant used a handgun during the incident but had time to dispose of the weapon prior to being apprehended. Detective Lee also testified that an eyewitnesses and a police officer, who was staking out the restaurant, positively identified defendant as the second perpetrator in the robbery. Thus, we find Detective Lee's testimony sufficient evidence for the grand jury to infer that a firearm was used in the commission of the robbery and the trial court did not err when it denied defendant's motion to dismiss the indictment for armed robbery. See *Rodgers*, 92 Ill. 2d at 290. Finding a valid indictment, we now review defendant's other claims.

¶ 42                                   Rule 401(a) Admonishment

¶ 43    Defendant's second contention is that his conviction should be reversed and the cause remanded for a new trial because the trial court did not properly admonish him pursuant to Supreme Court Rule 401(a) before it allowed him to waive his right to counsel.

¶ 44    Initially, we note that defendant failed to object to the comments at trial or in a posttrial motion, and therefore the issue was forfeited and cannot be considered on appeal unless it was plain error. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). We have repeatedly held that the trial court's failure to comply with Rule 401(a) denies a defendant his or her fundamental right to be represented by counsel and, therefore, is reviewable as plain error under the second prong of the doctrine. *People v. LeFlore*, 2013 IL App (2d) 100659, ¶ 51; *People v. Black*, 2011 IL App (5th) 080089, ¶ 23. Therefore, although defendant did not properly preserve this issue (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), we consider his claimed error under the plain error doctrine.

¶ 45    The sixth amendment of the United States Constitution guarantees a defendant the right to effective assistance of counsel at all critical stages of criminal proceedings. U.S. Const., amends. VI, XIV; *People v. Hughes*, 2012 IL 112817, ¶ 44. In Illinois, when a criminal defendant wishes to waive his right to counsel, a trial court may only permit a waiver after it first admonishes the defendant in accordance with Rule 401(a). *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). Rule 401(a) provides:

> "(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

> > (1) the nature of the charge;

- 11 -

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 46 "Strict, technical compliance with Rule 401(a) *** is not always required. Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, *and* the admonishment the defendant received did not prejudice his rights." (Emphasis added.) *People v. Haynes*, 174 Ill. 2d 204, 236 (1996). In limited circumstances, this court has found that a deficiency in the admonishments does not prejudice the defendant in instances where: (1) the defendant already knows of the omitted information or (2) because the defendant's degree of legal sophistication makes evident his or her awareness of the omitted information. *LeFlore*, 2013 IL App (2d) 100659, ¶ 52 (quoting *People v. Gilkey*, 263 Ill. App. 3d 706, 711 (1994)). "The rule provides a procedure which eliminates any doubt that a defendant understands the nature and consequences of the charge against him before a court accepts his waiver of the right to counsel and precludes him from waiving the assistance of counsel without full knowledge and understanding." *People v. Johnson*, 123 Ill. App. 3d 128, 130 (1984) (citing *People v. Derra*, 92 Ill. App. 3d 1106, 1109 (1981)). Whether the trial court's admonishments complied with Rule 401(a) is a question of law, which we review *de novo. People v. Bahrs*, 2013 IL App (4th) 110903, ¶ 13.

¶ 47 Here, we find that the trial court's failure to substantially comply with Rule 401(a) rendered defendant's waiver of his right to counsel unknowing and involuntary. Defendant was first admonished that he was eligible for consecutive sentences with a range of 21 to 45 years in prison. Then in the same proceeding, after prompting from the State, the court admonished defendant that he was eligible for an extended-term sentence with a maximum range of 60 years in prison. The court admonished defendant again during a later proceeding and informed defendant that he was not eligible for consecutive sentences, but based on his criminal history and the fact that he used a handgun during the robbery, he faced a concurrent sentence of 21 to 60 years in prison. However, during defendant's sentencing hearing, the State informed the court that defendant's criminal history made him eligible for a maximum sentence of 75 years in prison.

¶ 48 Rule 401(a) explicitly requires the court to "inform[ ] [defendant] of and determin[e] that he understands" his maximum sentence prior to accepting his waiver of counsel. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Thus, based on the clear and unambiguous language of Rule 401(a), the trial court's incorrect admonishments regarding defendant's maximum sentence compels the conclusion that defendant did not make a knowing and voluntary waiver of his right to counsel. Therefore, we find that defendant's waiver was invalid. See *Bahrs*, 2013 IL App (4th) 110903, ¶¶ 14-15; *People v. Koch*, 232 Ill. App. 3d 923, 927-28 (1992).

¶ 49 The State, however, contends that although the trial court misstated defendant's maximum sentence, the court's actions did not prejudice defendant because he was ultimately sentenced to 50 years, well below the 60-year sentence that the trial court informed him. We disagree. Our supreme court has made it abundantly clear that the purpose of the Rule 401(a) admonishment is to ensure that a waiver of counsel is knowingly and voluntarily made. See *Haynes*, 174 Ill. 2d at 241; *People v. Coleman*, 129 Ill. 2d 321, 333

(1989); *People v. Johnson*, 119 Ill. 2d 119, 132 (1987); *Derra*, 92 Ill. App. 3d at 1111 (in determining whether a waiver of counsel is valid " '[t]he letter and spirit of Supreme Court Rule 401(a) cannot be cavalierly disregarded' " (quoting *People v. Bolden*, 59 Ill. App. 3d 32, 35 (1978))). Therefore, on appeal, "the burden is not on the defendant to show a lack of prejudice in order to reach the question of whether the record affirmatively shows a knowing and voluntary waiver of counsel." *Bahrs*, 2013 IL App (4th) 110903, ¶ 56. "If the defendant has suffered no prejudice, it is only because the record shows the defendant's waiver of counsel was knowing and voluntary, that is, the goal of Rule 401(a) has been achieved." *Id.* Moreover, this court has noted that, under the second prong of the plain error analysis, an unknowing waiver of the right to counsel is such a serious error due to the right involved that prejudice will be presumed. See *Black*, 2011 IL App (5th) 080089, ¶¶ 25-26 (rejecting the State's argument that the defendant was required to show prejudice under prong-two plain error analysis where the trial court failed to comply with Rule 401(a)).

¶ 50      In this case, we find that regardless of the sentence that defendant actually received, we cannot say for certain that defendant would have proceeded to represent himself *pro se* had he known that he was facing 75 years in prison instead of 60 years. Finding otherwise would mean that, in cases where the court misstates a defendant's maximum sentence but does not sentence him in excess of that sentence, a reviewing court may speculate as to whether a defendant still would have waived his right to counsel had the trial court properly admonished him, effectively taking the decision to waive counsel out of the hands of the defendant. See *Koch*, 232 Ill. App. 3d at 927 (declining to presume that the defendant would have waived his right to counsel even if he had been correctly informed of the possible sentence he was later given). The purpose of Rule 401(a) is to avoid such a result. See *Johnson*, 123 Ill. App. 3d at 130.

¶ 51      Furthermore, we do not find that defendant's case falls within either limited exception where this court has found a deficiency in the admonishments does not prejudice the defendant, that is where: (1) the defendant already knows of the omitted information or (2) because the defendant's degree of legal sophistication makes evident his or her awareness of the omitted information. *LeFlore*, 2013 IL App (2d) 100659, ¶ 52. It is for this reason that we reject the State's reliance on *Johnson*, 119 Ill. 2d 119, and *Coleman*, 129 Ill. 2d 321, to support its contention that a court can substantially comply with Rule 401(a), even though it misstates the sentencing range.

¶ 52      In *Johnson*, the trial court incorrectly stated that the defendant's minimum sentence was a " 'number of years' " when his prior murder conviction required a minimum sentence of natural life in prison. *Johnson*, 119 Ill. 2d at 129. Despite the incorrect admonishment, our supreme court held that the trial court substantially complied with Rule 401(a) and the defendant's waiver of his right to counsel was knowingly and voluntarily made because "the record reveals that he was aware of this penalty." *Id.* at 132. Similarly, in *Coleman*, the trial court incorrectly told defendant that he was facing a minimum of 20 years in prison when his previous murder conviction made him eligible for a minimum sentence of natural life in prison. *Coleman*, 129 Ill. 2d at 334. Our supreme court held that although the trial court failed to inform the defendant that he was eligible to receive a minimum sentence of natural life, "[t]he record reveals that from his arraignment to the closing arguments at his sentencing hearing, the defendant knew and understood that natural life imprisonment was the minimum sentence prescribed by law." *Id.* at 335. There is nothing in the instant case that remotely

suggests, and the State does not argue, that defendant already knew of the possible penalty prior to waiving his right to counsel such as the defendants in *Johnson* and *Coleman*. In fact, the court never properly admonished defendant that he was eligible for a maximum sentence of 75 years, and he was not made aware until the State informed the court during his sentencing hearing.

¶ 53        Furthermore, both *Coleman* and *Johnson* are inapposite because the defendants in those cases were informed that the maximum sentence was the death penalty and that was the sentence that was imposed. In the instant case, defendant was misinformed regarding his maximum sentence. See *Bahrs*, 2013 IL App (4th) 110903, ¶ 15 (while a misstatement of the minimum sentence "is excusable if the defendant [is] sentenced to death," understating the maximum penalty does not satisfy Rule 401(a)).

¶ 54        Alternately, the State argues that defendant's deficient admonishments did not constitute reversible error because his case falls within the second exception where this court has found no prejudice for a deficient admonishment when a defendant's degree of legal sophistication makes evident his or her awareness of the omitted information. See *LeFlore*, 2013 IL App (2d) 100659, ¶ 52. Specifically, the State, relying on *People v. Eastland*, 257 Ill. App. 3d 394 (1993), argues that defendant's admonishments did not constitute reversible error because he displayed a high level of legal sophistication in filing and arguing pretrial motions and in representing himself during trial. In *Eastland*, the defendant represented himself in his first trial, which ended in a mistrial, as well as in his second trial, which ended in his conviction. *Id.* at 395-99. He was ultimately sentenced to concurrent terms of 60 years for rape and two counts of deviate sexual assault, and a 15-year term for two counts of aggravated kidnapping to run consecutively with the other sentences. In the second trial, the trial court failed to fully comply with Rule 401(a), omitting to admonish him that he could receive consecutive sentences. *Id*. at 399. Nevertheless, this court found no reversible error. *Id*. One of the reasons was that the defendant had "exhibited a high degree of legal sophistication." *Id.*

¶ 55        We find *Eastland* distinguishable. First, before the defendant in *Eastland* waived his right to counsel during his first trial, the court informed him that he could possibly receive a life sentence. *Id*. During the second trial, the court told the defendant that he could receive 30 to 60 years. Nonetheless, this court found that although the trial court failed to advise the defendant of his eligibility to receive consecutive sentences at the second trial, the defendant's "presence during the first trial indicates his awareness of the minimum, maximum, extended or consecutive sentences available for his alleged crimes." *Id.* As support for this contention, the court *then* referenced the defendant's "high degree of legal sophistication perhaps gained from his presence throughout these proceedings," as evidence that he was already aware of the possibility that he could receive consecutive sentences. *Id.*

¶ 56        In the instant case, although we agree that defendant appeared to possess somewhat of a high level of legal sophistication, we do not believe that this made his knowledge of the maximum sentence evident. First, unlike the defendant in *Eastland*, defendant was never given an accurate statement of the maximum punishment he faced prior to waiving his right to counsel or was otherwise aware of the penalty. Therefore, we cannot assume that defendant knew or should have known the maximum penalty because he intelligently argued his case. A trial court's admonishments regarding the maximum penalty must be accurate *before* the court accepts the defendant's waiver of counsel. *Koch*, 232 Ill. App. 3d at 927. Also, we note that unlike defendant in the instant case, the defendant in *Eastland* had

received the technical assistance of standby counsel in his second trial which further supported the court's holding. *Eastland*, 257 Ill. App. 3d at 400. Thus, we reject the State's argument in this case that defendant's high degree of legal sophistication renders his waiver of counsel knowing and voluntary.

¶ 57    The State also relies on *People v. Phillips*, 392 Ill. App. 3d 243 (2009), to support its position that defendant's admonishments did not constitute reversible error because defendant had extensive experience in the criminal justice system. However, we find the State's argument unavailing for the same reason as we did in *Eastland*. In *Phillips*, the trial court accurately admonished the defendant of the minimum and maximum penalties he faced, but failed to admonish him about the nature of the charges or his right to counsel. *Id.* at 262-63. The appellate court held that there was substantial compliance with Rule 401(a) because defendant had been, *inter alia*, fully admonished nine months before trial when the possibility of waiver was first discussed at length and again a month before trial. *Id.* As a further basis for finding substantial compliance, the court noted that "defendant had extensive experience with the court system," and had been charged with the same crime he was convicted of in that case "a number of times before." *Id.* at 264. Again, in the instant case, even though defendant possessed a criminal history that included three previous robbery charges, including a 1994 conviction for armed robbery, and apparent knowledge of criminal procedure because he had previously represented himself *pro se*, there is no evidence that defendant was otherwise aware of the maximum sentence before he waived counsel as the trial court never gave him an accurate admonishment at any point during proceedings. Thus, we find *Phillips* inapposite.

¶ 58    We note that the only case that the State relies on where the trial court's misstatement of the maximum sentence does not amount to reversible error is *People v. Ray*, 130 Ill. App. 3d 362 (1984). In *Ray*, the trial court admonished defendant that he was eligible for a sentence of three to seven years; however, on appeal this court stated that "[t]he record indicate[d]" that he was actually eligible for an extended-term sentence of a maximum of 14 years. *Id.* at 364. The court ultimately sentenced defendant to the minimum sentence of three years. This court found that although the court failed to properly admonish defendant that he was subject to an extended-term sentence, defendant was "[o]bviously *** not prejudiced by the lack of the admonishment" because none were imposed. *Id.* at 365. We agree with defendant that it is unclear from the facts of *Ray* whether the trial court knew at sentencing that the defendant was even subject to an extended term when it imposed the defendant's sentence. In the instant case, the State informed the court during defendant's sentencing hearing that his criminal history made him eligible for a maximum sentence of 75 years. However, defendant did not receive the same benefit of knowing the maximum sentence he faced before he waived his right to counsel. Therefore, unlike in *Ray*, the court ultimately considered an entirely different sentencing range at sentencing than the one defendant contemplated before waiving his right to counsel. Thus, we decline to extend the holding in *Ray* to facts in the instant case.

¶ 59    We also reject the State's reliance on cases where the issue concerns whether a defendant received proper admonishments under Illinois Supreme Court Rule 402 (eff. July 1, 1997). Although these cases may be instructive (see *Bahrs*, 2013 IL App (4th) 110903, ¶ 31), they do not concern the fundamental right to counsel. Finding that defendant did not already know his maximum sentence or possess a degree of legal sophistication that made evident his

awareness of the maximum sentence, we believe that, regardless of the sentence the defendant ultimately received, he was prejudiced when he unknowingly waived his right to counsel.

¶ 60　　Because we find that the trial court's pretrial admonishments failed to substantially comply with Rule 401(a) prior to accepting defendant's waiver to counsel, we need not reach defendant's claims that his posttrial admonishments were similarly deficient. Accordingly, we reverse defendant's conviction and remand this case to the circuit court for a new trial. On remand, defendant must be given the opportunity to either be represented by an attorney or to make a knowing and intelligent waiver of that right, which will occur only after he is given proper admonishments as required by Rule 401(a). See *LeFlore*, 2013 IL App (2d) 100659, ¶ 60.

¶ 61　　Finding defendant's conviction should be reversed, we now address the remainder of defendant's claims in order to provide instruction on remand.

¶ 62　　　　　　　　　　　　Exclusion of Codefendant's Statement

¶ 63　　Defendant's third contention is that the trial court erred when it improperly excluded codefendant's statement that codefendant committed this crime with a BB gun. During trial, defendant made an offer of proof that codefendant told Detective Lee that he committed this crime with a BB gun. Defendant contends that codefendant's statement should have been admitted as a statement against penal interest.

¶ 64　　We note that defendant frames this contention as a constitutional issue, citing *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, the defendant was prevented under the state's evidentiary rules from cross-examining McDonald, who had confessed to the crime but subsequently recanted, and from introducing the testimony of three witnesses to McDonald's confessions. *Id.* at 297. The Court reversed the defendant's conviction because it found that the confession in that case was so overwhelming and substantially corroborated by some evidence that exclusion of the evidence of the confession violated the defendant's due process and thus deprived him of a fair trial. *Id.* at 287-301. However, the *Chambers* court explicitly noted the narrowness of the ruling stating that "we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id.* at 302-03.

¶ 65　　We find that the facts of this case do not rise to the level of a constitutional due process violation as in *Chambers*. Instead, we find that defendant's contention is more appropriately reviewed for admissibility as a statement against penal interest under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011). Defendant concedes that he failed to properly preserve this issue; however, because defendant argues that the admissibility of the hearsay statement in this case interfered with his substantial right to present a defense, we will review the issue under the plain error doctrine. See *People v. Caffey*, 205 Ill. 2d 52, 90 (2001). However, before we can determine whether the plain error rule applies, we must first determine whether an error actually occurred. See *People v. Cosby*, 231 Ill. 2d 262, 273 (2008).

¶ 66    A hearsay exception applies to declarations against penal interest. *People v. Tenney*, 205 Ill. 2d 411, 433 (2002). Illinois Rule of Evidence 804(b)(3) provides that a statement that tends to subject a declarant to civil or criminal liability, and that is corroborated, is admissible. *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 135. Our supreme court in examining Federal Rule of Evidence 804(b)(3), which is identical to our rule, identified three conditions that must be satisfied before a statement will be admitted under the rule: "(1) the declarant must be unavailable; (2) the declarant's statement must have been against his or her penal interest; and (3) corroborating circumstances must support the trustworthiness of the statement." *Id.* (citing *People v. Rice*, 166 Ill. 2d 35, 43 (1995)). Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion. *Caffey*, 205 Ill. 2d at 89. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 67    First, we agree with the State that the threshold issue before a court can consider a statement against interest for admissibility is whether the declarant was "unavailable" for purposes of Rule 804(b)(3). Pursuant to Illinois Rule of Evidence 804(a)(1), a witness's exercise of a privilege satisfies the requirement of unavailability. Accordingly, a declarant who properly asserts his fifth amendment right not to testify is unavailable for purposes of Rule 804(b)(3). *Caffey*, 205 Ill. 2d at 101. The record reveals that in a sidebar conference, which took place during the State's case-in-chief, defendant made an offer of proof that Detective Lee would testify that codefendant said he committed the robbery with a black BB gun. However, defendant acknowledged that the statement was hearsay and that he needed "the actual person" to testify. Following the sidebar, defendant resumed his cross-examination of Detective Lee, during which he attempted to elicit codefendant's statement. The assistant State's Attorney objected, and the trial court sustained the objection, stating that "[w]e are not going into the statement, the nature of the conversation with [codefendant]." Subsequently, prior to defendant's case-in-chief, the trial court conducted a hearing on the record outside of the presence of the jury with the codefendant present. During the hearing, the codefendant invoked his right not to testify under the fifth amendment. Thus, the record clearly shows that codefendant was unavailable for purposes of Rule 804(b)(3), as defendant was not able to call him as a witness to testify regarding his statement to Detective Lee.

¶ 68    We find, additionally, that codefendant's statement was against his penal interest, and we reject the State's contention that the statement was not "unquestionably" so. The State cites *Williamson v. United States*, 512 U.S. 594 (1994), in an attempt to argue that codefendant's full hearsay statement was self-serving and not credible because although codefendant inculpates defendant by stating that it was defendant's idea to commit the robbery, he qualifies his own culpability by stating that he committed the crime because he "had no job, no money, and no place to live" and "had nothing to lose." In *Williamson*, following a traffic stop, an officer found Harris with two suitcases of cocaine in his trunk. *Id.* at 596. During a subsequent interview with a Drug Enforcement Administration (DEA) agent, he admitted that he was knowingly transporting the cocaine. *Id.* After initially lying about the source of the cocaine, he told the agent that the defendant had supplied him with the cocaine. *Id.* Harris would not testify at the defendant's trial, but the district court allowed the government to introduce Harris's statements through the DEA agent who interviewed him as a statement

against interest pursuant to Federal Rule 804(b)(3). *Id.* at 597. The Supreme Court held that admission of the statement that Williamson had supplied the cocaine was error because although Harris freely implicated himself, the statement "did little to subject Harris himself to criminal liability." *Id.* at 604. Moreover, the Court viewed Harris's statement as shifting the blame to the defendant. See *id.* at 609 (Scalia, J., concurring) (finding that although some of Harris's statements incriminated him, they provided only marginal evidence of his guilt and "project[ed] an image of a person acting not against his penal interest, but striving mightily to shift principal responsibility to someone else").

¶ 69        In the instant case, we note that, unlike in *Williamson*, it was defendant, and not the State, who was seeking to have admitted the hearsay statement, and as previously acknowledged, the admissibility of a hearsay statement which allegedly supports the defense's theory of the case implicates a defendant's substantial right to present a defense. See *Caffey*, 205 Ill. 2d at 90; *People v. Bean*, 137 Ill. 2d 65, 81 (1990). Furthermore, our review of the statement reveals that, unlike the declarant in *Williamson*, although codefendant does give reasons as to why he committed the robbery, we do not find that the reasons in any way lessen his culpability as he ultimately confessed to Detective Lee that he committed the robbery with defendant.

¶ 70        Notwithstanding our finding of the declarant's unavailability and that his statement was against penal interest, we cannot say that the trial court abused its discretion. Our review of the record reveals that defendant failed to pursue having the statement admitted once codefendant's unavailability was established. Specifically, following codefendant's invocation of his fifth amendment right not to testify, there is no indication from the record that defendant, during his case-in-chief, either attempted to call Detective Lee in order to elicit codefendant's statement or requested a sidebar conference to discuss the admissibility of the statement. Thus, we find that defendant effectively abandoned the issue, and the trial court made no further rulings on the admissibility of the statement. Therefore, we find that the trial court did not abuse its discretion when it excluded codefendant's statement because defendant had not established, at the time of the court's ruling, the conditions for admissibility under Rule 804(b)(3). Absent a finding of error, there can be no plain error. *People v. Williams*, 193 Ill. 2d 306, 349 (2000). Further, because we find that codefendant was unavailable to testify at defendant's trial and the statement was against codefendant's penal interest, should this issue arise again on remand, the trial court is instructed to find codefendant's statement inadmissible only if defendant is unable to satisfy the conditions for admissibility under Rule 804(b)(3).

¶ 71                                    Sufficiency of the Evidence

¶ 72        Defendant's fourth contention is that the State failed to prove codefendant possessed a "firearm" as defined under the Code because the State did not introduce a firearm and relied solely on the insufficient testimony of the Baker's Square employees.

¶ 73        When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 330 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the responsibility of the trier of fact to "fairly ***

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. It follows that where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). However, the reviewing court should not substitute its judgment for that of the trier of fact, who is responsible for weighing the evidence, assessing the credibility of witnesses, resolving conflicts in the evidence, and drawing reasonable inferences and conclusions from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must set aside a defendant's conviction if a careful review of the evidence reveals that it was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 74    Defendant was charged under section 18-2(a)(2) of the Code (720 ILCS 5/18-2(a)(2) (West 2010)) with armed robbery in that codefendant committed robbery and carried on or about his person, or was otherwise armed with, a firearm. Section 2-7.5 of the Code (720 ILCS 5/2-7.5 (West 2010)) provides that the term "firearm" has the meaning ascribed to it in section 1.1 of the Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/1.1 (West 2010)), that is, "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," but specifically excluding any pneumatic gun, spring gun, paint ball or BB gun, any device used exclusively for signaling or safety, or for the firing of industrial ammunition, and an antique firearm that is primarily a collector's item. The State does not have to prove the gun is a firearm by direct or physical evidence; unequivocal testimony of a witness that the defendant held a gun is circumstantial evidence sufficient to establish that a defendant was armed during a robbery. See *People v. Lee*, 376 Ill. App. 3d 951, 955 (2007); *People v. Thomas*, 189 Ill. App. 3d 365, 371 (1989).

¶ 75    We find that the evidence was sufficient to find defendant guilty of armed robbery with a firearm beyond a reasonable doubt. It is undisputed that codefendant possessed a gun during the robbery; however, defendant maintains that because the witnesses only viewed the handle of the gun, their testimonies are insufficient to find he had an actual firearm. We disagree.

¶ 76    Defendant avers that this court in *People v. Malone*, 2012 IL App (1st) 110517, erroneously relied on *People v. Ross*, 229 Ill. 2d 255 (2008), and *People v. Washington*, 2012 IL 107993, instead of current statutory law; we nonetheless find *Malone* instructive in the instant case. In *Malone*, a single victim testified that during the robbery the defendant held what appeared to be a gun. *Malone*, 2012 IL App (1st) 110517, ¶ 28. This testimony was corroborated with a surveillance video showing defendant holding what looked to be an actual gun. *Id.* The defendant in *Malone* similarly argued that the gun was never recovered and the witness' testimony was deficient because she did not provide a detailed description of the gun, "so there is no way to compare characteristics of the gun with those of a real or toy gun to determine what the object in the offender's hand was." *Id.* ¶ 41. The court rejected this argument, stating that the victim's testimony, coupled with the videotape of the offense, was sufficient, and "[t]here was no contrary evidence presented that the gun was a toy gun, a BB gun, or anything other than a 'real gun.' " *Id.* ¶ 52. We believe that the same result is warranted in the instant case. While there is no surveillance video of the crime as in *Malone*, the three eyewitnesses had ample opportunity to view the weapon at a close distance during

the robbery, and although it was the handle of the gun, we find this identification sufficient. At trial, Perez testified that during the incident codefendant told him that "this is a robbery," and then lifted up his hoodie to reveal a gun. Perez stated that he felt the barrel of the gun as codefendant pressed it into his back as he walked to the office and that he was "100% sure" that codefendant's gun was "an actual firearm" as he had seen guns before. Tsegaye similarly testified that defendant pulled up his shirt and showed her a gun in his waistband, and told her that "you're being robbed." Morina testified that he had seen guns before and that he believed that codefendant's gun was a "9 millimeter pistol." Viewing the testimony in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was armed with a gun that met the statutory definition of firearm and convicted him of armed robbery with a firearm.

¶ 77    Defendant acknowledges that *Ross* concerned a pre-firearm version of the statute; however, he believes that we should consider this case for guidance because, similar to his case, although the victim testified that the defendant had a firearm, the item was actually a BB gun. However, we find this case wholly inapposite. In *Ross*, the victim testified that defendant robbed him with a firearm. Police officers located the defendant and as they approached, they observed the defendant throw something into a bush. Upon inspection, the officers discovered the victim's wallet and a BB gun. The State did not offer the gun into evidence, but the officer who recovered the gun described it as "a 4.5 BB caliber gun with a three inch barrel." *Ross*, 229 Ill. 2d at 258. Additionally, the inventory sheet in the record listed the gun as a BB gun. While there was sufficient evidence in *Ross* that indicated that the crime was committed with a BB gun, there is no such evidence in the instant case linking codefendant to the BB gun, only defendant's conjecture that the BB gun was used the night of the robbery. Therefore, we reject defendant's reliance on *Ross*.

¶ 78    Moreover, defendant attempts to link the BB gun to his case and relies on *People v. Johnson*, 2013 IL App (1st) 120413, for the contention that "the State routinely convicts defendants of gun crimes despite lack of fingerprints." In *Johnson*, a handgun was recovered in the gutter of a home approximately one block away from the scene of a robbery. *Id.* ¶ 9. Although there were no fingerprints recovered from the weapon, the firearm was admitted into evidence. However, defendant fails to note that the victim of the robbery testified that the recovered gun looked like the gun he saw the night of the robbery and the homeowner testified during trial that she had heard a commotion near the garbage cans near her home on the night of the robbery. *Id.* This is not the case here. Neither of the victims positively identified a BB gun as being the gun used in the crime. In fact, when defendant showed Perez a photo of the BB gun recovered on the night of the robbery, Perez simply stated "[he] couldn't tell" whether it was the weapon used the night of the robbery. Additionally, unlike *Johnson*, there is absolutely no additional testimony that connects the BB gun to the night of the robbery. Thus, we reject defendant's reliance on *Johnson* and find that the State's evidence was sufficient to prove that codefendant was armed with a firearm during the robbery.

¶ 79    We note that because the evidence was sufficient to convict defendant, double jeopardy does not preclude defendant's retrial. *People v. Liner*, 356 Ill. App. 3d 284, 300 (2005). We emphasize, however, that this determination is not binding on retrial and does not express an opinion regarding defendant's guilt or innocence.

¶ 80                                  Jury Instructions

¶ 81    Defendant's final contention is that the trial court erred by not *sua sponte* instructing the jury on the definition of a "firearm," where evidence at trial showed a BB gun was found in the area where the codefendant fled. Defendant concedes that he did not preserve this issue in a posttrial motion, but contends that we should review for plain error under Illinois Supreme Court Rule 451(c). Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). Illinois Supreme Court Rule 366 provides that a party that fails to tender a jury instruction may not raise the failure to give the instruction on appeal. Ill. S. Ct. R. 366 (eff. Feb. 1, 1994). Rule 451(c) provides that "substantial defects [in jury instructions in criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013).

¶ 82    "The function of instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence." *People v. Fuller*, 205 Ill. 2d 308, 343-44 (2002) (citing *People v. Williams*, 181 Ill. 2d 297, 318 (1998)). It is well established that a defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997) (citing *People v. Crane*, 145 Ill. 2d 520, 526 (1991)). "Very slight evidence upon a given theory of a case will justify the giving of an instruction." *Jones*, 175 Ill. 2d at 132 (citing *People v. Bratcher*, 63 Ill. 2d 534, 540 (1976)).

¶ 83    Here, defendant offered slight evidence contesting whether codefendant committed the robbery with a firearm, which would justify the giving of the definitional instruction on firearms. However, because we reverse and remand this case on other grounds, we need not determine whether the trial judge's failure to *sua sponte* give the definitional instruction was error.

¶ 84                                  CONCLUSION

¶ 85    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 86    Reversed and remanded with instructions.